Sara L. Chenetz, CA Bar No. 206936
SChenetz@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA  90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Conte Cicala, CA Bar No. 173554
conte.cicala@withersworldwide.com
WITHERS BERGMAN LLP
909 Montgomery St, Ste 300
San Francisco, CA 94133-4651
Telephone: 415-872-3234
Facsimile: 415-548-4214

*Attorneys for CAI International, Inc., a Delaware corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Spinnaker Equipment Services, Inc., a California corporation,<br><br>    Plaintiff,<br><br>        v.<br><br>Pan Ocean Container Supplies Co., Ltd., a Chinese limited company,<br><br>    Defendant,<br><br>and<br><br>CAI International, Inc., a Delaware corporation,<br><br>Textainer Ltd., a Bermuda limited company,<br><br>Textainer Equipment Management (U.S.) Ltd., a Delaware corporation,<br><br>Textainer Equipment Management (U.S.) II LLC, a Delaware limited liability company,<br><br>    Garnishees. | Case No.4:25-cv-00782-YGR<br><br>**DECLARATION OF DAVID MORRIS IN SUPPORT OF CAI INTERNATIONAL, INC.'S MOTION TO VACATE WRIT, OBJECTION TO WRIT, TO QUASH INTERROGATORIES AND FOR RELATED RELIEF**<br><br>Hearing:<br>Date: March 4, 2025<br>Time:  2:00 p.m.<br>Place: Oakland Courthouse<br>        Courtroom 1, 4th Floor<br>        1301 Clay Street<br>        Oakland, CA 94612 |

DECLARATION OF DAVID MORRIS

I, David B. Morris. declare as follows:

1. I am the chief financial officer of CAI International, Inc. ("CAI"). I make this declaration in support of CAI's Objection to Writ and Motion to Vacate Writ and to Quash Interrogatories. The facts stated herein are based on my own personal knowledge, as further described below. If called to testify, I could and would testify competently to the facts stated herein.

2. I am familiar with the proceedings commenced by and allegations made by the plaintiff in the above-captioned case. I understand that Corporation Services Company ("CSC") is CAI's registered agent for service of process in California. I understand that CSC received a series of documents (collectively "Documents") on February 7, 2025 in connection with this action and sent the entire set of Documents to CAI on or about February 9, 2025. In total, the Documents are 108 pages in length. Attached hereto as Exhibit 1 is a true copy of the Documents and the one page transmittal from CSC to CAI. Among the Documents is a two-page document titled Writ for Maritime Attachment and Garnishment ("Writ").

3. The plaintiff in this matter, Spinnaker Equipment Services, Inc., is a direct competitor of CAI International, Inc.

4. As a part of my responsibilities, I have general oversight responsibility for all financial records at CAI and its affiliates, including among other records, those regarding the contracts in place between CAI and third parties and contracts in place between CAI's affiliates and third parties.

5. CAI does not have any contracts with Pan Ocean Container Supplies Co., Ltd., a Chinese limited liability company ("POCS"), the party named as the defendant in this action, nor is CAI a guarantor for any contracts with POCS. CAI does not owe any money or performance obligations to POCS. One of CAI's affiliates does purchase goods from POCS from time to time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and information.

Executed this 25th day of February 2025, at San Francisco, CA.

180159327.3

1

2

By:_____

3

4

David B. Morris

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

180159327.3

# EXHIBIT 1



**null / ALL**
**Transmittal Number: 30771704**
**Date Processed: 02/09/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Julia Brown<br>CAI International, Inc.<br>1 Market Plz<br>Fl 24<br>San Francisco, CA 94105-1102 |
| **Electronic copy provided to:** | Lesa Lopez |

| | |
|---|---|
| **Entity:** | CAI International, Inc.<br>Entity ID Number  2558483 |
| **Entity Served:** | Cai International, Inc. |
| **Title of Action:** | Spinnaker Equipment Services, Inc. vs. Pan Ocean Container Supplies Co., Ltd. |
| **Matter Name/ID:** | Spinnaker Equipment Services, Inc. vs. Pan Ocean Container Supplies Co., Ltd. (16874466) |
| **Document(s) Type:** | Garnishment/Withholding |
| **Nature of Action:** | Garnishment/Withholding |
| **Court/Agency:** | U.S. District Court Northern District, CA |
| **Case/Reference No:** | 25-782 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 02/07/2025 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Simms Showers LLP<br>443-290-8704 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# SIMMS·SHOWERS LLP

INTERNATIONAL PRACTICE. PERSONAL COMMITMENT.

J. STEPHEN SIMMS
PRINCIPAL
JSSIMMS@SIMMSSHOWERS.COM
443.290.8704

February 7, 2025

**BY HAND DELIVERY**

CAI International, Inc.
c/o CSC – Lawyers Incorporating Service
2710 Gateway Oaks Drive, #150
Sacramento, California 95833

Re:    ***Spinnaker Equipment Services, Inc.. v. Pan Ocean
Container Supplies Co., Ltd., et al.***
**U.S. District Court for the Northern District of California**

Dear Sir or Madam:

With this letter is a Process of Maritime Attachment and Garnishment ("Writ") issued to you/affiliates, as well as a copy of the Verified Complaint, Orders to issue and serve Writ, and Interrogatories.

The Writ and Interrogatories require a formal response within 21 days of service.

In advance of formal response, however, please contact us by email or phone. Depending on whether any property is held or owed, it may be possible to resolve the garnishment writs before formal response is required. We also would be glad to extend the time for response.

Sincerely,

J. Stephen Simms

J. Stephen Simms (*pro hac vice* pending)
Gary C. Muphy (*pro hac vice* pending)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
443-290-8704
Facsimile 410-510-1789
jssimms@simmsshowers.com
gcmurphy@simmsshowers.com

Marisa G. Huber
GIBSON ROBB & LINDH LLP
1255 Powell Street
Emeryville, California 94608
Phone: (415) 348-6000
Facsimile: (415) 346-6001
Email: mhuber@gibsonrobb.com

Attorneys for Plaintiff
Spinnaker Equipment Services, Inc.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Spinnaker Equipment Services, Inc., a California corporation, | Case No. 25-782 |
| Plaintiff, | IN ADMIRALTY, Fed. R. Civ. P. 9(h) |
| v. | |
| Pan Ocean Container Supplies Co., Ltd., a Chinese limited company, | **WRIT FOR MARITIME ATTACHMENT AND GARNISHMENT** |
| Defendant, | |
| and | |
| CAI International, Inc., a Delaware corporation, | |
| Textainer Ltd., a Bermuda limited company, | |
| Textainer Equipment Management (U.S.) Ltd., a Delaware corporation, | |

1
2
3

Textainer Equipment Management (U.S.) II
LLC, a Delaware limited liability company,

    Garnishees.

4   **TO GARNISHEE:** CAI International, Inc.

5   THE U.S. MARSHAL FOR THE NORTHERN DISTRICT OF CALIFORNIA

6   GREETINGS:

7
8       WHEREAS, on January 23, 2025, Plaintiff filed a Verified Complaint against Defendant
Pan Ocean Container Supplies Co. Ltd., for reasons in said complaint mentioned for the sum of
9   **USD $12,883,752.00** (herein, the "Garnishment Amount") as demanded for the breach of
maritime contracts, and praying for process of maritime attachment and garnishment against the
10  property of said Defendant; and

11      WHEREAS, this process is issued pursuant to such prayer and requires that Garnishee shall
serve Garnishee's answer within twenty-one (21) days after service of process upon the
12  Garnishee and requires that Defendant shall serve its answer within thirty (30) days after process
has been executed, whether by attachment of property or service on the Garnishee,
13

14      NOW, THEREFORE, you are hereby commanded that if the said Defendant cannot be found
within the District, you attach goods, chattels, credits and effects located and to be found in this
15  District belonging to Defendant, or in the hands of the Garnishee named, up to the Garnishment
Amount and as further demanded in the Verified Complaint and how you shall have executed
16  this process, make known to this Court with your certificate of execution thereof written.

17                              WITNESS THE HONORABLE
18                              Judge of said Court, in said District,
                            this   __7th__   day of February, 2025.
19

20                              MARK B. BUSBY, CLERK

21  

22                              BY: _Kim Means_
                            Deputy Clerk

23
24  NOTE: This process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain
Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

25
26
27
28

---

Writ for Maritime Attachment and Garnishment                     Page 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SPINNAKER EQUIPMENT SERVICES, INC.**, a California corporation, | Case No. 4:25-cv-00782-YGR |
| Plaintiff, | **ORDER APPROVING ISSUANCE OF WRITS** |
| v. | Re: Dkt. Nos. 3, 16, 17, 18 |
| **PAN OCEAN CONTAINER SUPPLIES CO., LTD.**, a Chinese limited company, | |
| Defendant, | |
| and | |
| **CAI INTERNATIONAL, INC., ET AL.**, a Delaware corporation, | |
| **TEXTAINER LTD.**, a Bermuda limited company, | |
| **TEXTAINER EQUIPMENT MANAGEMENT (U.S.) LTD.**, a Delaware corporation, and | |
| **TEXTAINER EQUIPMENT MANAGEMENT (U.S.) II LLC**, a Delaware limited liability company, | |
| Garnishees. | |

The Court is in receipt of plaintiff Spinnaker Equipment Services, Inc. ("Spinnaker")'s revised writs for maritime attachment and garnishment. (Dkt. No. 19.) The revised writs are **APPROVED**, and the Clerk of Court is **ORDERED** to issue the writs in accordance with the Court's order **GRANTING** plaintiff's *ex parte* application for issuance of process of maritime attachment and garnishment and appointment of special process server. (Dkt. No. 18.)

This terminates Dkt. No. 3.

**IT IS SO ORDERED.**

Dated: February 6, 2025

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

J. Stephen Simms (*pro hac vice* pending)
Gary C. Muphy (*pro hac vice* pending)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
443-290-8704
Facsimile 410-510-1789
jssimms@simmsshowers.com
gcmurphy@simmsshowers.com

Marisa G. Huber
GIBSON ROBB & LINDH LLP
1255 Powell Street
Emeryville, California 94608
Phone: (415) 348-6000
Facsimile: (415) 346-6001
Email: mhuber@gibsonrobb.com

Attorneys for Plaintiff
Spinnaker Equipment Services, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Spinnaker Equipment Services, Inc., a California corporation, | Case No. |
| Plaintiff, | IN ADMIRALTY, Fed. R. Civ. P. 9(h) |
| v. | |
| Pan Ocean Container Supplies Co., Ltd., a Chinese limited company, | **VERIFIED COMPLAINT; REQUEST FOR ISSUANCE OF SUPPLEMENTAL RULE B MARITIME ATACHMENT AND GARNISHMENT WRIT;** |
| Defendant, | **AND IN THE ALTERNATIVE REQUEST** |
| and | **FOR ISSUANCE OF A WRIT OF ATTACHMENT PUSUANT TO FED. R. CIV. P. 64(a) AND CALIFORNIA CIVIL CODE** |
| CAI International, Inc., a Delaware corporation, | |
| Textainer Ltd., a Bermuda limited company, | |
| Textainer Equipment Management (U.S.) Ltd., a Delaware corporation, | |

1   Textainer Equipment Management (U.S.) II
2   LLC, a Delaware limited liability company,

3      Garnishees.

4

5

6       Spinnaker Equipment Services, Inc. ("Spinnaker") brings this action against Pan

7   Ocean Container Supplies Co, Ltd, ("Pan Ocean"), *quasi in rem*, pursuant to Supplemental Rule

8   B for Certain Admiralty and Maritime Claims, requesting issuance of process of maritime

9   attachment and garnishment, including against Garnishees.  In the alternative, Spinnaker seeks

10   an order permitting prejudgment writs of attachment in accordance with California Code of Civil

11   Procedure, section 481.010 et seq. and Fed R. Civ. P. 64(a). Spinnaker, states as follows:

12                 **Jurisdiction and Venue**

13

14      1.    This is an action within the Court's admiralty jurisdiction pursuant to 28 U.S.C.

15   §1333 and is an admiralty or maritime claim within Fed. R. Civ. P. 9(h). Spinnaker further

16   brings this action pursuant to 9 U.S.C. §§ 1, 8 for security for arbitration which Spinnaker has

17   initiated against Pan Ocean in Hong Kong pursuant a purchase agreement for the purchase and

18   sale of marine cargo containers between Spinnaker and Pan Ocean, as more fully detailed

19   below.

20      2.    Jurisdiction is also proper under 28 U.S.C. § 1332(a) because there is diversity

21   and the amount in controversy exceeds $75,000, exclusive of interests and costs.

22

23      3.    Venue is proper in this District because Garnishees can be found in this District.

24      4.    Venue is also proper in this District because, upon information and belief, Pan

25   Ocean's property is or soon will be in this District, namely through accounts payable due to Pan

26   Ocean, because Garnishees are located or are found in this District.

27      5.    Defendant cannot be found in this District within the meaning of Supplemental

28

Rule B.

## The Parties

6.      Spinnaker is a corporation organized under the laws of California and located in this District with its principal place of business in San Francisco, CA. It is in the business of both leasing and selling new and used marine cargo containers.

7.      Pan Ocean is a Chinese corporation that manufactures and sells marine cargo containers. Its address is Economic Development Zone of Hangzhou Bay Avenue, North Side of Hangzhou Bay Road, Haiyan 314305, Zhejiang Province, the People's Republic of China.

8.      Garnishee CAI International, Inc. ("CAI") is a global transportation company that offers intermodal container leasing and sales with a principal office, and directors, located in this District in San Francisco, CA.   Spinnaker, on information and belief, as detailed below, reasonably believes CAI holds accounts or property of and/or owing to Pan Ocean.

9.      Garnishees Textainer Ltd. (a Bermuda corporation registered in California), Textainer Equipment Management (U.S.) Ltd. (a Delaware corporation registered in California), and Textainer Equipment Management (U.S.) II LLC (a Delaware limited liability company registered in California), (collectively "Textainer") are, upon information and belief, related companies that are intermodal container lessors and resellers of used containers. Textainer maintains an office and resident agent located in this District in San Francisco, CA. Spinnaker, on information and belief, as detailed below, reasonably believes Textainer holds accounts or property of and/or owing to Pan Ocean.

## Facts

10.      On or about August 7, 2019, Spinnaker and Pan Ocean (collectively "Parties") entered into a written purchase agreement – "Agreement Number: SES/POCS-2019" (herein "Agreement") – where Spinnaker agreed to purchase from Pan Ocean, and Pan Ocean agreed to

sell, marine cargo containers manufactured by Pan Ocean. This Agreement formed a maritime

contract between the Parties. The Agreement was further expressly incorporated into

subsequent purchase orders -- also maritime contracts - between the Parties.

11.   Clause 14 of the Agreement provides:

This Agreement shall be governed by the laws of Hong Kong SAR. Any controversy,

dispute, or claim arising out of or in relation to the interpretation or otherwise of any of

the causes of this Agreement shall be finally settled in accordance with the rules of

Hong Kong International Arbitration Center. The proceedings shall take place in Hong

Kong SAR, and shall be held in English language.

12.   Clause 11 of the Agreement provides:

The rights and remedies of both parties provided in this Agreement and any applicable

Purchase Order shall not be exclusive but in addition to any rights and remedies

provided by the law of any jurisdiction.

13.   Clause 5 of the Agreement provides:

a)  The parties agree that it would be impracticable or extremely difficult to fix the

actual damage arising from the Seller's failure to deliver the Containers. Therefore,

in the event Seller fails to make any of the Containers ready for delivery within 15

days after the end of the contractual month in which any such container is scheduled

to be produced and delivered, except for reasons of Force Majeure as defined in

Clause 12, then the Seller shall be liable to the Buyer for liquidated damages at the

rate of US$5.0 for each 20' Dry Container (or as otherwise set forth in the applicable

purchase order) until the day on which the Seller makes each such container ready

for delivery. If the Containers, or any of them, have not been made so ready for

delivery by 15 days after the end of the scheduled production month, whether for

reason of Force Majeure or otherwise, the Buyer may, at its sole option, terminate this Agreement with respect to any undelivered containers by seven (7) day's notice in writing without prejudice to any other rights and remedies then or thereafter available to the Buyer hereunder or otherwise.

b)  Liquidated damages payable under this Clause shall be in addition to, and not in lieu of, any damages to which the Buyer may be entitled if this Agreement is terminated due to the Seller's default, and the Buyer's rights and remedies shall in no way be diminished or impaired by reason of the inclusion of the foregoing liquidated damages provision in this Agreement.

14.    On or about February 24, 2021, March 1, 2021, and March 3, 2021, Spinnaker placed, and Pan Ocean accepted, a series of purchase orders for marine cargo containers.

15.    The containers purchased by Spinnaker were anticipated to be used on maritime vessels and immediately placed into ocean service for the movement of maritime freight. This use was consistent with past marine cargo containers purchased from Pan Ocean that Spinnaker had leased to shipping lines or a Non-Vessel Operating Common Carriers ("NVOCC") who – in turn - placed them on an ocean-going vessel.

16.    Clause 1.a of the Agreement provided that the "design construction and production of the Containers ....[were] subject to final approval by Buyer and or Buyer's Customer, if applicable."

17.    Pan Ocean manufactured and delivered only a portion of the marine cargo containers ordered and accepted on or about February 24, 2021. Pan Ocean failed to manufacture or make ready for delivery, at any time, some of the containers ordered and accepted on February 24, 2021.

18.     Pan Ocean failed to manufacture or make ready for delivery, at any time, all of the containers ordered on March 1, 2021, and March 3, 2021.

19.     Pursuant to the Agreement, Spinnaker, on or about July 30, 2021, commenced arbitration with the Hong Kong International Arbitration Centre.

20.     On June 15, 2022, the arbitrator appointed by the Hong Kong International Arbitration Centre issued a "Final Award" ordering:

a.   Pan Ocean to pay Spinnaker liquidated damages in the sum of US$ 4,080,240.

b.   Pan Ocean to pay Spinnaker damages for non-delivery in the sum of US$ 5,923,372.

c.   Pan Ocean to pay Spinnaker pre-award interest on the principal amount of US$ 4,080,240 accrued on simple basis at 2.125% from April 16, 2021, to June 15, 2022.  [By Spinnaker's calculation is results in an amount of US$ 100,957.99].

d.   Pan Ocean to pay Spinnaker pre-award interest on the principal amount of US$ 5,923,372 accrued on simple basis at 4.25% from December 16, 2021, to June 15, 2022. [By Spinnaker's calculation this results in an amount of US$ 124,837.09].

e.   Pan Ocean to pay Spinnaker the costs of arbitration in the amount of HK$ 209,046.72 [US$ 26,629.98 at time of award as calculated by Spinnaker] and US$ 50,875.67.

f.   Pan Ocean to pay Spinnaker post-award interest on the amounts of US$ 4,080,240; US$ 4,080,240; HK$ 209,046.72 and US$50,875.67 the rate of interest determined by the Chief

Justice under section 49(1)(b) (interest of judgments) of the Hong Kong High Court Ordinance Cap. 4 from the date of this Final Award until full payment is made.

21.     The total amount owed to Spinnaker by Pan Ocean under the arbitration "Final Award," plus awarded attorney fees, is now at least US$12,883,752.00.  Interest and legal fees continue to accrue.

22.     Spinnaker previously (on or about October 10, 2022) commenced enforcement action on the "Final Award" in the mainland Chinese court system – specifically the Ningbo Maritime Court – and obtained an order granting its application for property preservation – freezing 73,170,834.85 RMB (i.e. Renminbi -China's currency) of Pan Ocean's funds– the provisional equivalent of US$ 10,306,912.73.

23.     Upon Pan Ocean's funds being frozen in China, Pan Ocean applied to the Hong Kong Court to set aside the arbitration award.  The Hong Kong Court, on July 9, 2024, denied Pan Ocean's request.  Pan Ocean subsequently applied for leave to appeal against the Hong Kong Court's decision of July 9, 2024.  A hearing of that application took place on November 14, 2024. The Court's decision following that hearing is pending

24.     Pan Ocean has not paid Spinnaker the amounts due under the "Final Award," and interest continues to accrue.

**Specific Allegation - Garnishees**

25.     **Garnishee CAI:**  Spinnaker reviewed records, including from independent investigation and Production Schedule and Yard Inventory Reports, showing CAI recently conducted – or is conducting - business with Pan Ocean and thus, likely has accounts payable to Pan Ocean.  Spinnaker, therefore, reasonably believes this Garnishee owes accounts or holds property of Pan Ocean.

26.     **Garnishees Textainer:**  Spinnaker reviewed records, including from independent investigation and Production Schedule and Yard Inventory Reports, showing Textainer recently conducted – or is conducting - business with Pan Ocean and thus, likely has accounts payable to Pan Ocean.  Spinnaker therefore reasonably believes these Garnishees owe accounts or hold property of Pan Ocean.

<u>Count I – Breach of Maritime Contract – Security for Arbitration</u>

27.     Spinnaker repeats and incorporates the previous paragraphs as though fully set forth herein.

28.     Pan Ocean breached the Agreement – a maritime contract – with Spinnaker and caused Spinnaker damages, which are subject to Hong Kong arbitration, for which damages, as outlined in paragraph 20 above, were awarded in a "Final Award" to Spinnaker. Spinnaker seeks additional security by way of funds and other property held by Garnishees as demanded below.

<u>Count II – Process of Maritime Attachment and Garnishment (Supplemental Rule B)</u>

29.     Spinnaker repeats and incorporates the previous paragraph as though fully set forth herein.

30.     Spinnaker seeks issuance of process of maritime attachment and garnishment so that it may obtain security for its claims in arbitration as detailed in the arbitration "Final Award," and which is before the Chinese court for enforcement.

31.     Pan Ocean cannot be found within this District within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction consisting of cash, property including intangible property, funds, accounts owed or held for Pan Ocean, and/or credits in the hands of one or more garnishees in this District, including the Garnishees.

32.    Spinnaker therefore respectfully requests the Court to issue writs of maritime garnishment pursuant to Supplemental Rule B as set out below.

### Count III – Writ of Attachment –
### California Code of Civil Procedure, Section 481.010 et seq.).
### In the Alternative

33.    Spinnaker repeats and incorporates paragraphs 1-26 as though fully set forth herein.  Spinnaker seeks a writ of attachment under the California Code of Civil Procedure – in the alternative – should this Court determine that the Agreement is not a maritime contract. **Exhibit 1,** hereto.

34.    Fed R. Civ. P. 64(a) provides that:

(a) Remedies Under State Law—In General. At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.

(b) Specific Kinds of Remedies. The remedies available under this rule include the following—however designated and regardless of whether state procedure requires an independent action:  arrest; attachment; garnishment; replevin; sequestration; and other corresponding or equivalent remedies.

35.    California Civil Code of Civil Procedure 481.010 *et seq.* permits prejudgment writs of attachment.

36.    An order of attachment may be issued for a claim of money based on an express or implied contract where the total amount of such claim is a fixed or readily ascertainable amount not less than $500.00. *See* Cal. Code Civ. Proc. § 483.010(a).

37.    Spinnaker's claim is a readily ascertainable amount that exceeds $500.

38.    Spinnaker's claim is based on an expressed contract, specifically, a foreign arbitral award based on a written contract between Spinnaker and Pan Ocean.  *See generally*

*Dehua Venture Cap. Inv. Co. v. Cuiwen*, No. 522CV00108JAKSPX, 2023 WL 1481592, at *4 (C.D. Cal. Jan. 11, 2023), *report and recommendation adopted sub nom. Dehua Venture Cap. Inv. Co. v. Lin Cuiwen*, No. 5:22-CV-00108-JAK-SP, 2023 WL 1478432 (C.D. Cal. Feb. 1, 2023), and *report and recommendation adopted sub nom. Dehua Venture Cap. Inv. Co. v. Lin Cuiwen*, No. 5:22-CV-00108-JAK-SP, 2023 WL 2064049 (C.D. Cal. Feb. 15, 2023)

39.    An affidavit further supporting Spinnaker's right to attach, and the "probable validity" of the claim as required per Cal. Code Civ. Proc. § 484.030, 484.040, and 484.090 is attached as **Exhibit 2,** hereto.

40.    Spinnaker does not seek the attachment for a purpose other than recovery of the claim upon which the request for attachment is based.

41.    Accounts payable to, or held by the garnishees for, Pan Ocean are attachable and not exempt from attachment under California law. See Cal. Code Civ. Proc. § 484.090(b); see also id. § 487.010; id. § 487.020.

### Prayer for Relief

WHEREFORE, Spinnaker prays:

A.    That, as Pan Ocean cannot be found within this District, and pursuant to Supplemental Rule B, this Court issue an Order directing the Clerk to issue Process of Maritime Attachment and Garnishment to garnish and attach property of Pan Ocean including, but not limited to, accounts payable or to be owed from Garnishees to Pan Ocean in the amount of **US $12,883,752.00.** (the "Final Award" plus awarded attorney fees detailed above)(herein, the "Security Amount");

B.    That, Process provides for the attaching of all tangible or intangible property, or any funds held by any Garnishee, up to the Security Amount; and that upon that total amount being garnished and attached, this action to be stayed pending the

Hong Kong court's decision on Pan Ocean's application for leave to appeal its July 9, 2024 decision;

C.   That, any persons claiming any interest in the property attached by such Process be cited to appear and, pursuant to Supplemental Rule B, answer the matters alleged in this Verified Complaint;

D.   That, a person over 18 years of age be appointed as moved for herein, pursuant to Supplemental Rule B and Fed. R. Civ. P. 4(c), to serve Process of Maritime Attachment and Garnishment;

E.   That, should this Court find that the Agreement is not a maritime contract, in the alternative, this Court issue an Order for Writs of Attachment pursuant to California Civil Code of Civil Procedure 481.010 *et seq* to garnish and attach property of Pan Ocean including, but not limited to, accounts payable or to be owed from Garnishees to Pan Ocean in the amount of **US $12,883,752.00** (the "Final Award" plus awarded attorney fees, again herein the "Security Amount") and that said Writs provide for the attaching of all tangible or intangible property, or any funds held by any Garnishee, up to the Security Amount; and that upon that total amount being garnished and attached, this action to be stayed pending the Hong Kong's court's decision on Pan Ocean's application for leave to appeal its July 9, 2024 decision.

F.   That this Court award Spinnaker such other and further relief that this Court deems just and proper.

Date: January 23, 2025.

Respectfully submitted,

GIBSON ROBB & LINDH LLP

Marisa G. Huber
mhuber@gibsonrobb.com

/s/ J. Stephen Simms
J. Stephen Simms (*pro hac vice* pending)
Gary C. Muphy (*pro hac vice* pending)
Simms Showers LLP

Spinnaker Counsel

## VERIFICATION –

### AFFIDAVIT THAT DEFENDANT IS NOT FOUND WITHIN THE DISTRICT PURSUANT TO SUPPLEMENTAL RULE B

I, Timothy Britton, am the CEO of Spinnaker Equipment Services, Inc. ("Spinnaker").

The facts alleged in the foregoing Complaint are true and correct to the best of my knowledge and information, based upon the records of Spinnaker and other information available to me. I am authorized to make this verification on Spinnaker's behalf.

I further certify that, pursuant to Supplemental Rule B, I caused a search to be made of electronic records and Directory Assistance for addresses and telephone numbers in this District. I understand there is no record of any general or resident agent authorized to accept service of process for Defendant in this District.

Pursuant to 28 U.S.C. §1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

Executed on January 23, 2025.

Timothy Britton
CEO, Spinnaker Equipment Services, Inc

## SPINNAKER EQUIPMENT SERVICES, INC.

### PURCHASE AGREEMENT

### AGREEMENT NUMBER:   SES/POCS-2019

SPINNAKER EQUIPMENT SERVICES, INC. (hereinafter referred to as the "BUYER") with office at 601 Montgomery Street, Suite 520, San Francisco, CA 94111, USA and PAN OCEAN CONTAINER SUPPLIES CO., LTD. (hereinafter referred to as the 'SELLER") with office at Economic Development Zone of Hangzhou Bay Avenue, on the North side of Haiyan County, Zhejiang Province, China hereby enter into this Purchase Agreement on August 7, 2019.

This Purchase Agreement shall be incorporated into any Purchase Order issued by Buyer to Seller when incorporated by the terms of such Purchase Order. After the first such incorporation, this Purchase Agreement shall be incorporated into any subsequent Purchase Order issued by Buyer to Seller unless otherwise provided in that subsequent Purchase Order. If there is a conflict between this Purchase Agreement and any Purchase Order, that Purchase Order shall prevail.

This Purchase Order may be amended, modified, or changed only by an agreement in writing. No changes by Seller shall bind Buyer unless they are signed or initialed by Buyer's authorized representative.

**Witness**

In consideration of the mutual covenants herein contained, Buyer agrees to purchase and Seller agrees to sell marine cargo containers (hereinafter referred to as Containers in singular or plural) under the following terms and conditions:

## 1. Purchase and sale of Containers - Specification and Drawings

Subject to the terms and conditions set forth in this Agreement, Buyer agrees to purchase from Seller and Seller agrees to produce, sell and deliver Containers as per the applicable Purchase Order:

**Specifications and Drawings**

a) The Containers shall be built of corten steel. The design, construction and production of the Containers shall fully comply with descriptions, drawings, standards and regulations referenced in the applicable Purchase Order, subject to final approval by Buyer and or Buyer's Customer, if applicable.

b) A prototype of the Containers shall be manufactured well in advance of the series and shall be submitted to a test program as indicated in the applicable Purchase Order. The Prototype shall be certified by one of the major international Classification Societies (II-TT type certification). Such certificates are hereinafter referred to as the "Classification Society Certificates". The issuance of Classification Society Certificates, however, will not relieve Seller of any of its obligations under this Agreement or the applicable Purchase Order.

c) The Seller shall carry out any modifications to the design and structure of the Containers as required by the Buyer from time to time, but so long as the parties shall first agree on additional or reduced costs (if any) arising from such modifications, in advance of actual production.

## 2. Inspection, acceptance and delivery

The Buyer will - itself or by its agent or representative surveyor - supervise the production and inspect and accept the Containers in the factory. The Seller shall permit the said representative of the Buyer access to their factory and subcontractors at all times before or during the construction of the Containers, and to inspect, examine and test the materials and workmanship of the Containers being produced.

Such supervision and inspection should be conducted so as not to unreasonably interfere with the manufacturing process and both parties will do their best to achieve this goal.

The Seller shall provide without charges all reasonable required office space, communications at the factory such as telephone, telex and telefax, and other similar

2

services for Buyer's representatives.

The Containers shall be presented for inspection in accordance with the Production Schedule as per Clause 7(a) below. The Seller shall give the Buyer at least 14 days' advance confirmation of the date when the Containers will be available for inspection, and inspection shall take place within 14 days after such confirmed date of availability. Unless the Buyer gives its prior approval, not less than 50 Containers must be presented at each instance of inspection – which means the consecutive number of days, weekends excluded, an inspection continues - and not less than 50 Containers for each day of inspection, except for the balance for the last day of inspection.

If less than the confirmed number of Containers are available for inspection, except for a grace amount of five Containers on average per day for each inspection instance, the Seller shall pay to the Buyer one full day's survey cost, which is USD 200. If less than 5 Containers are available, the Seller shall also pay the Buyer full traveling and accommodation costs for one return journey to the factory.

When a Container is presented "available for inspection" it must meet all technical and specification requirements set out in this Agreement and the applicable Purchase Order to at least a reasonable extent, so that the re-inspection after required rectification can be done within the original time of the respective instances of inspection.

When and if a Container fully complies with this Agreement and the applicable Purchase Order, the representative or agent of the Buyer shall sign the Technical Acceptance Certificate, which will be in the form of the specimen in Annexure I hereto.

The Seller shall deliver the Containers which were inspected and accepted by the Buyer to the depot designated by the Buyer or allow the Buyer or Buyer's customers to pick up the Containers which were inspected and accepted by the Buyer in the Seller's factory or container yard at the Buyer's sole decision/instruction.

The Seller has no authority to hold the Containers when the Buyer requests for delivery or pick up for whatever the reasons unless as specified as below.   Otherwise, the Seller shall be liable for the loss arising from the holding of the release of Containers to the Buyer, which including but not limited to the rental loss, customer claim, etc.   The Buyer shall have the right to deduct the loss amount from the next payment to the Seller.
However, the Seller can hold the Containers subject to ten days advance notice to the Buyer, if the Seller has sound/proved evidence to show that the Buyer has no ability to make the due payment.


**3. Prices etc.**

Per unit price is as stated in the applicable Purchase Order with Buyer's standard

3

specifications as described therein and delivered ex Buyer's designated depots in Shanghai, free on truck or as otherwise specified in the applicable Purchase Order.

The above prices include all testing and certification charges of the international Classification Society as well as on-line inspection and they are not subject to escalation for any reason whatsoever.

**4. Quantities etc.**

a) The Buyer shall place a firm order for Containers for production as described in the applicable Purchase Order by issuing a Purchase Order to Seller.

b) Production shall be deemed to have been made and a Container shall be deemed ready for delivery to the Buyer, when the conditions set out in Clause 1 above and the applicable Purchase Order have been fulfilled in respect of such Container and Buyer or its designated representative shall have signed the Technical Acceptance Certificate for each Container.

Title to a Container shall pass to Buyer upon the date of signing of the Technical Acceptance Certificate, provided that the full payment of the agreement price has been made by Buyer to Seller, and risk of loss of such Container shall be retained by Seller so long as the Container is in its possession or in the possession of the manufacturer. Acceptance by the Buyer will not relieve Seller of any its obligations under this Agreement and the applicable Purchase Order not theretofore satisfied.

c) Seller will secure for Buyer free storage, at manufacturer's plants after the end of each production month, for at least 180 days or as otherwise set forth in the applicable Purchase Order.

d) Containers shall be stored at manufacturer's plant at the full risk of Seller, normal wear excepted.

**5. Liquidated Damages**

a) The parties agree that it would be impracticable or extremely difficult to fix the actual damage arising from the Seller's failure to deliver the Containers. Therefore, in the event Seller fails to make any of the Containers ready for delivery within 15 days after the end of the contractual month in which any such Container is scheduled to be produced and delivered, except for reasons of Force Majeure as defined in Clause 12, then Seller shall be liable to Buyer for liquidated damages at the rate of USD5.0 for each 20' Dry Container (or as otherwise set forth in the applicable Purchase Order) until the day on which Seller makes each such Container ready for delivery. If the Containers, or any of them, have not been made so ready for delivery by 15 days after the end of the scheduled production month,

4

whether for reason of Force Majeure or otherwise, Buyer may, at its sole option, terminate this Agreement with respect to any undelivered Containers by seven (7) day's notice in writing without prejudice to any other rights and remedies then or thereafter available to Buyer hereunder or otherwise.

b) Liquidated damages payable under this Clause shall be in addition to, and not in lieu of, any damages to which the Buyer may be entitled if this Agreement is terminated due to Seller's default, and Buyer's rights and remedies shall in no way be diminished or impaired by reason of the inclusion of the foregoing liquidated damages provision in this Agreement.

## 6. Payment Terms

Except as otherwise provided in the applicable Purchase Order, payment shall be made by telegraphic transfer within 60 days after the Technical Acceptance Certificate signed by the inspector, upon receipt of the following documents within one and half months after acceptance date:

a)   Signed invoice in triplicate issued by the Seller.

b)   "Technical Acceptance Certificate" issued by the Buyer or its authorized representative/ surveyor, specimen in Annexure I or similar document.

c)   "Form A" Certificate of Origin, issued by the Chinese authorities.

d)   Classification Society Certificate covering each container invoiced.
     Certificates that Containers comply with CSC and TIR conventions and with Australian Quarantine regulations (TCT) - these certificates may be consolidated in one, also with Classification Society Certificate.

e)   Paint inspection report from paint supplier.

f)   Certificate of wood treatment.

g)   Bill of Sale

Any delay of the delivery of the subject certificates or documents by Seller would automatically grant the Buyer the freedom to delay the payment over one reasonable period of time.

## 7. Other documents

a)   Production report to inform Buyer of the production schedule a minimum 10 days prior

to the production date.

**b)**  Delivery reports to update Buyer of the delivery date, place and Container numbers. This report must be provided by the factory in time after delivery.

**c)**  Equipment Interchange Receipt (EIR) signed by the Buyer's customers.

**d)**  Confirmation Letter to confirm the receipt of payment from the Buyer after payment is received from the Buyer.

## 8. Customs Clearance and Tax

Seller shall be responsible for securing, at its own expense, any necessary customs clearance for export one time in China and payment of any initial export taxes in China imposed upon the transfer of title and risk of Containers to Buyer, or the export thereof to Buyer.

In addition, Seller shall bear and pay all taxes and duties imposed in China in connection with execution and / or performance of this Agreement and the applicable Purchase Order, or in connection with the Containers.

## 9. Warranties

**a) General warranty**

Seller warrants each Container to be in accordance with the agreed ISO-standard and also in accordance with the specifications given in Clause 1 and the applicable Purchase Order. In the event of any defect or deviation Seller will at its own expense make good the said defect or deviation or replace the defective Container at a location designated by the Buyer.

**b) Construction and production warranty**

Seller warrants each Container against any and all defects or omissions in design, workmanship, construction, components, material and performance for a period of two years after the date of the Classification Society Certificate relating to such Container. In the event that any defect or omission appears, or is shown by testing to exist, during the said period of two (2) years, Seller or repairers mutually agreed to by Buyer and Seller, will at Seller's expense and at a location designated mutually agreed by the Buyer and Seller make good the said defect or omission and will also make good such of the remainder of the Containers as are shown by testing to be defective. Normal wear and tear and any damages caused by mishandling, mis-securing, mis-loading, impact and / or accident, fire or acid spillage, are not covered by this warranty.

**c) Paint Warranty**

6

Seller warrants the pre - treatment of steel and application of paint against corrosion and paint failure for a period of five (5) years (Purchase Order Specification) after the date of the relevant Classification Society Certificate or as per the respective specification description. This warranty covers all faults affecting more than ten (10) percent of the painted surfaces of any Container and in the event of such faults, Seller will be liable to repaint part or all of the said painted surfaces as necessary, or to indemnify Buyer for the cost of such repainting. Normal wear and tear and corrosion caused by acids, fire or the result of damages by abrasion, impact or accidents are not covered by this warranty.

d) Decal and Marking Warranty

Seven (7) years exterior life shall be guaranteed, covering:

Adhesion: No failure at all (no significant loss of peel adhesion)
Shrinkage: Maximum 0.3%
Abrasion and shrinkage resistance.
Colors and film: Sun-, salt-, fuel- and waterproof.

e) The Seller need not provide warranty for the welded & painted areas of the additional lashing strips.


## 10. Patent Indemnity

Seller shall, with respect to the Containers or any part thereof, indemnify and hold harmless Buyer and its agents from cost and damage, as finally determined by any court of competent jurisdiction, plus reasonable attorney's fees, for infringement of any patent or patents, copyrights, industrial design right or other intellectual property - right of others by reason of the sale or use of the Containers, or any part thereof, provided that Seller is promptly notified of all such actual or threatened infringement suits known, and is given full and exclusive control of the defense thereof, at its expense, by Buyer. In case a Container or any part thereof furnished hereunder as a result of any suit or proceeding so defended is held to constitute infringement, and its use is enjoined, Seller shall, at its option and its expense, either (a) procure for the Buyer the right to continue using the Container; or (b) replace it with a substantially equivalent non-infringing Container without affecting the utility thereof.


## 11. Other Rights of Both Parties

The rights and remedies of both parties provided in this Agreement and any applicable Purchase Order shall not be exclusive but are in addition to any rights and remedies provided by the law of any jurisdiction.

7

## 12. Force Majeure

Neither party to this Agreement shall be liable to the other for non- performance (either wholly or in part) or delay in performance of the terms and conditions of this Agreement due to a Force Majeure event. As used herein, a "Force Majeure event" shall be one or more of the following: war-like operation, Act of God, strikes, lockout, flood, earthquakes, typhoon, embargoes, curtailment, failure in the supply of electric current, fuel or other energy sources. In case of any such event, the terms of this Agreement relating to time or performance shall be suspended during the continuance of the event. If any such event shall continue for a period of ninety (90) days, then Buyer may by giving seven (7) days' prior written notice to Seller, terminate this Agreement and on the expiration of the notice period (unless performance of the Agreement becomes once again possible before the expiration of the notice period), this Agreement shall be terminated with respect to any of the Containers which were not ready for delivery at the commencement of the Force Majeure event or events, but without prejudice to all other rights and remedies accrued at the said date.

## 13. Assignment

Seller may not assign this Agreement or sub-contract or delegate its duties hereunder without the prior written consent of the Buyer and any purported assignment without such consent shall be null and void. The Buyer shall be entitled at any time to transfer its rights and obligations under this Agreement to any of its associates or subsidiaries or to any other party, provided that in case of any transfer of obligations, Buyer shall first obtain the written consent of the Seller.

## 14. Applicable Law - Arbitration

This Agreement shall be governed by the laws of Hong Kong SAR. Any controversy, dispute or claim arising out of or in relation to the interpretation or otherwise of any of the clauses of this Agreement shall be finally settled in accordance with the rules of Hong Kong International Arbitration Center. The proceedings shall take place in Hong Kong SAR, and shall be held in English language.

## 15. Annexures

Attached and part of this Agreement is:

Annexure I to Purchase Agreement

8

**16. Notices**

All notices required to be given by either party shall be in writing and shall be airmailed, telexed or cabled, to the address first stated above, except as may otherwise be provided in any Purchase Order, or at such other address as such party may hereafter from time to time designate in writing and shall be deemed received, in the case of airmail, five days after it is postmarked, and in the case of telex, upon transmission (with answer back confirmed) to the other party's telex facilities.

**Spinnaker Equipment Services, Inc.**

By: _____

Title: Chief Operating Officer

Date: 8-16-2019

**Pan Ocean Container Supplies Co., Ltd.**

By: _____

Title: _____

Date:

9

ANNEXURE I to Purchase Agreement

### TECHNICAL ACCEPTANCE CERTIFICATE

This is to certify that the following_____ dry cargo containers with all steel

welded construction and _____ kgs maximum gross weight rating built by

_____with _____factory

located at_____

have been accepted by the undersigned on behalf of Spinnaker Equipment Services, Inc. and

found all in satisfactory condition and have been manufactured in accordance with

contractual specification no. _____, model no._____.

Container unit numbers:

For and on behalf of Spinnaker Equipment Services, Inc.

_____

Authorized Signature

Name:

Date:

10

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Spinnaker Equipment Services, Inc.,

    Plaintiff,

v.

Pan Ocean Container Supplies Co., Ltd.,

    Defendant,

and

CAI International, Inc.

Textainer Ltd.

Textainer Equipment Management (U.S.) Ltd.

Textainer Equipment Management (U.S.) II LLC

    Garnishees.

Case No.

IN ADMIRALTY, Fed. R. Civ. P. 9(h)

### AFFIDAVIT OF JUERGEN MOLL

Juergen Moll certifies as follows:

1.      I am over 18 years old and competent to make this affidavit.

2.      I am the President of Spinnaker Equipment Services, Inc., ("Spinnaker") a corporation organized under the laws of California and located in this District, with its principal place of business in San Francisco, CA. I have personal knowledge of the matters set forth in this affidavit and am authorized to execute this affidavit on behalf of Spinnaker.

3.      I submit this affidavit in support of Spinnaker's in-the-alternative request for a Writ of Attachment pursuant to Federal Rules of Civil Procedure 64(a) and California Civil

Code.

4.    On or about August 7, 2019, Spinnaker and Defendant Pan Ocean Container Supplies Co., Ltd., ("Pan Ocean") (collectively "Parties") entered into a written purchase agreement – "Agreement Number: SES/POCS-2019" (herein "Agreement") – where Spinnaker agreed to purchase from Pan Ocean, and Pan Ocean agreed to sell marine cargo containers manufactured by Pan Ocean. The Agreement was further expressly incorporated into subsequent purchase orders between the Parties.

5.    Clause 14 of the Agreement provides:

This Agreement shall be governed by the laws of Hong Kong SAR. Any controversy, dispute, or claim arising out of or in relation to the interpretation or otherwise of any of the causes of this Agreement shall be finally settled in accordance with the rules of Hong Kong International Arbitration Center. The proceedings shall take place in Hong Kong SAR and shall be held in English language.

6.    Clause 11 of the Agreement provides:

The rights and remedies of both parties provided in this Agreement and any applicable Purchase Order shall not be exclusive but in addition to any rights and remedies provided by the law of any jurisdiction.

7.    On or about February 24, 2021, March 1, 2021, and March 3, 2021, Spinnaker placed, and Pan Ocean accepted, a series of purchase orders for marine cargo containers.

8.    Pan Ocean manufactured and delivered only a portion of the marine cargo containers ordered and accepted on or about February 24, 2021. Pan Ocean failed to manufacture or make ready for delivery, at any time, some of the containers ordered and accepted on February 24, 2021.

2

9.    Pan Ocean failed to manufacture or make ready for delivery, at any time, all of the containers ordered on March 1, 2021, and March 3, 2021.

10.    Pursuant to the Agreement, Spinnaker, on or about July 30, 2021, commenced arbitration with the Hong Kong International Arbitration Centre.

11.    On June 15, 2022, the arbitrator appointed by the Hong Kong International Arbitration Centre issued a "Final Award" ordering:

    a.    Pan Ocean to pay Spinnaker liquidated damages in the sum of US$4,080,240.

    b.    Pan Ocean to pay Spinnaker damages for non-delivery in the sum of US$5,923,372.

    c.    Pan Ocean to pay Spinnaker pre-award interest on the principal amount of US$4,080,240 accrued on simple basis at 2.125% from April 16, 2021, to June 15, 2022. [by Spinnaker's calculation, this results in an amount of US$100,957.99].

    d.    Pan Ocean to pay Spinnaker pre-award interest on the principal amount of US$5,923,372 accrued on simple basis at 4.25% from December 16, 2021, to June 15, 2022. [by Spinnaker's calculation, this results in an amount of US$124,837.09].

    e.    Pan Ocean to pay Spinnaker the costs of arbitration in the amount of HK$209,046.72 [US$ 26,629.98 at time of award as calculated by Spinnaker] and US$50,875.67.

    f.    Pan Ocean to pay Spinnaker post-award interest on the amounts of US$4,080,240; US$4,080,240; HK$209,046.72 and US$50,875.67, the rate of interest determined by the Chief Justice under section 49(1)(b) (interest of judgments) of the

Hong Kong High Court Ordinance Cap. 4 from the date of this Final Award until full payment is made.

12.     A true and correct copy of the arbitrator appointed by the Hong Kong International Arbitration Centre's "Final Award," is attached hereto as **Exhibit A.**

13.     As of December 31, 2024, the total amount owed to Spinnaker by Pan Ocean under the arbitration "Final Award," plus awarded attorney fees, is now at least US$12,883,752.00.  Interest and legal fees continue to accrue.

14.     Spinnaker previously (on or about October 10, 2022) commenced enforcement action on the "Final Award" in the mainland Chinese court system – specifically the Ningbo Maritime Court – and obtained an order granting its application for property preservation – freezing 73,170,834.85 RMB (i.e. Renminbi -China's currency) of Pan Ocean's funds– the provisional equivalent of US$10,306,912.73 at the time of the application.

15.     Upon Pan Ocean's funds being frozen in mainland China, Pan Ocean applied to the Hong Kong Court to set aside the arbitration award.  The Hong Kong Court, on July 9, 2024, denied Pan Ocean's request.  A true and correct copy of the Hong Kong Court's July 9, 2024, decision is attached hereto as **Exhibit B.**

16.     Pan Ocean subsequently applied for leave to appeal against the Hong Kong Court's decision of July 9, 2024.  A hearing of that application took place on November 14, 2024. The Court's decision following that hearing is pending.

17.     Spinnaker – consistent with the expressed terms of the Agreement – that "[a]ny controversy, dispute, or claim arising out of or in relation to the interpretation or otherwise of any of the causes of this Agreement shall be finally settled in accordance with the rules of Hong Kong International Arbitration Center" contends that the "Final Award" is final, and that

4

Spinnaker is likely to prevail in any appeal, in the event leave to appeal were granted.

18.    Pan Ocean has not paid Spinnaker the amounts due under the "Final Award," and interest continues to accrue.

19.    Spinnaker is willing and able to immediately post a bond or $10,000 cashier's check with the Court in lieu of bond as an undertaking prior to this Court issuing any writ under California Civil Code.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 20, 2025.

Juergen Moll
President, Spinnaker Equipment Services, Inc.

5

HKIAC/A21141

IN THE MATTER OF AN ARBITRATION
UNDER THE 2018 HONG KONG INTERNATIONAL ARBITRATION CENTRE
ADMINISTERED ARBITRATION RULES
CASE NO. : HKIAC/ A21141

BETWEEN

SPINNAKER EQUIPMENT SERVICES INC        CLAIMANT
(UNITED STATES)

AND

PAN OCEAN CONTAINER SUPPLIES CO.,        RESPONDENT
LTD (MAINLAND CHINA)

## FINAL AWARD

### 15 June 2022

CONNIE H.Y LEE

(Sole Arbitrator)

1

## A.    PARTIES TO THE ARBITRATION

### A1.   The Claimant

1.    The claimant in this arbitration is SPINNAKER EQUIPMENT SERVICES INC (the "**Claimant**"), a company incorporated in California, USA with its address at 601 Montgomery Street, Suite 520, San Francisco, California 94111, USA.

2.    The Claimant is represented in this arbitration by its counsel:-

Mr. Ruaridh Guy and Ms. Bridget Yim
Ince & Co
Suites 4404-4410, 44/F One Island East,
18 Westlands Road, Taikoo Place, Hong Kong
Tel: +852 2877 3221
Email: ruaridhguy@incegd.com/ bridgetyim@incegd.com

### A2.   The Respondent

3.    The respondent in this arbitration is Pan Ocean Container Supplies Co. Ltd (the "**Respondent**"). As notified by the Claimant, the Respondent is company incorporated in the People's Republic of China (the "**PRC**"), whose address is at Economic Development Zone of Hangzhou Bay Avenue, North Side of Hangzhou Bay Road, Haiyan 314305, Zhejiang Province, the PRC.

4.    The Respondent's email addresses and fax number provided are:-

Email: ylqin@chinapanocean.com
Fax: +86 573 8905 2333

## B.    THE ARBITRAL TRIBUNAL

5.    The Arbitral Tribunal is:-

Ms. Connie H.Y Lee
c/o Des Voeux Chambers
38/F Gloucester Tower,
The Landmark Central,
Hong Kong
Tel: +852 2526 3071

2

Fax: +852 2810 5287

Email: connie.lee@dvc.com.hk

appointed by the Hong Kong International Arbitration Centre (the "**HKIAC**") as the sole arbitrator in accordance with Article 7.2 of the 2018 HKIAC Administered Arbitration Rules (the "**Rules**").

## C.   ARBITRATION AGREEMENT AND CHOICE-OF-LAW

6.   Clause 14 of the Purchase Agreement with reference SES/POCS-2019 dated 7 August 2019 entered into between the parties (the "**Agreement**"), provides that:-

"This Agreement shall be governed by the laws of Hong Kong SAR. Any controversy, dispute or claim arising out of or in relation to the interpretation or otherwise of any of the clauses of this Agreement shall be finally settled in accordance with the rules of Hong Kong International Arbitration Centre. The proceedings shall take place in Hong Kong SAR, and shall be held in English language."

## D.   PROCEDURAL HISTORY OF THE ARBITRATION
### D1.   Commencement of the Arbitration and Constitution of the Arbitral Tribunal

7.   On 2 August 2021, the HKIAC acknowledged receipt of the Claimant's Notice of Arbitration dated 30 July 2021 (the "**Notice**"). In the Notice, the Claimant's Counsel also:-

(1)   proposed that the matter be dealt with by a sole arbitrator;

(2)   applied for directions that the arbitration is to be conducted in accordance with the Expedited Procedure pursuant to Article 42.1 of the Rules.

8.   By the same letter dated 2 August 2021, the HKIAC:-

(1)   requested documentary verification showing the date of receipt by the Respondent of the Notice and the supporting materials therewith;

(2)   requested the Claimant to clarify whether it wishes to make an application for Expedited Procedure pursuant to Article 42.1 of the Rules;

(3)   invited the Respondent to submit any comments it might have regarding the Claimant's proposal that the matter be dealt with by a sole arbitrator.

3

9.  On 3 August 2021, the Claimant's Counsel provided response and the documents enclosed thereto to the HKIAC confirming that:-

    (1)  The Notice and the enclosures therein had been delivered to the Respondent by courier at the address mentioned in **Section A2** above (the "**Respondent's Address**") on 2 August 2021 at 15:29. The same was also sent through to the Respondent by air mail, email and facsimile on 30 July 2021.

    (2)  The Claimant wished to make an application for the Expedited Procedure under Article 42 of the Rules;

    (3)  The email address for Ms. Bridget Yim was misstated in the Notice.

10. By letter dated 12 August 2021, the Claimant's Counsel also confirmed that:-

    (1)  the Claimant was not listed/designated under a sanction regime;

    (2)  the Claimant did not (a) directly or indirectly own or control a party nor (b) was directly or indirectly owned or controlled by a party nor (c) was affiliated to a party in any other way, which was listed/designated under a sanction regime;

    (3)  the subject matter of the dispute did not fall within the scope of a sanction regime; and

    (4)  the Claimant was not aware of any administrative measure or restrictive measures applicable to the Respondent, but of course that would be ultimately something for the Respondent to confirm.

11. With respect to the Answer to the Notice (the "**Answer**"), the HKIAC reminded the Respondent by its letter dated 2 August 2021, 4 August 2021, 12 August 2021 and 23 August 2021 that the Answer should be filed in accordance with Article 5.1 of the Rules i.e. by 30 August 2021. The said letters were delivered to the Claimant's Counsel (by email) and the Respondent (by courier to the Respondent's Address, by fax to +86 573 8905 2333 and by email to ylqin@chinapanocean.com.)

12. In the letter dated 31 August 2021, the HKIAC put on record the fact that the Respondent had not submitted its Answer. By the same letter, the HKIAC also informed the parties that:-

4

    (1)   since they had failed to agree on the method for determining the fees of the arbitral tribunal, pursuant to Article 10.1 of the Rules, the arbitral tribunal's fees shall be calculated on the basis of hourly rates in accordance with Schedule 2 of the Rules;

    (2)   it would first determine the Expedited Procedure application before determining the number of arbitrators and again invited the Respondent to provide comments on the number of arbitrators.

13.   By letter dated 2 September 2021, the HKIAC:-

    (1)   acceded to the Claimant's application for Expedited Procedure; and

    (2)   invited the parties to jointly designate the sole arbitrator by 17 September 2021.

14.   By letter dated 17 September 2021, the HKIAC put on record that the parties had not been able to jointly designate the sole arbitrator within the applicable time limit. In light of such failure to jointly designate the sole arbitrator, the HKIAC invited the parties to advise whether they had any objection to the holder of a Hong Kong SAR passport being considered for appointment as the sole arbitrator in the matter.

15.   By letter dated 24 September 2021, the HKIAC again put on record that the parties had not been able to jointly designate the sole arbitrator and it had not received any objection to the holder of a Hong Kong SAR passport being considered for appointment as the sole arbitrator in the matter. The HKIAC therefore indicated that it would proceed to appoint the sole arbitrator pursuant to Article 7.2 of the Rules. The same letter was delivered to the Claimant's Counsel (by email) and the Respondent (by courier to the Respondent's Address, by fax to +86 573 8905 2333 and by email to ylqin@chinapanocean.com).

16.   By letter dated 5 October 2021, the HKIAC indicated its intention to appoint Ms. Connie Lee as the sole arbitrator and drew the parties' attention to (1) Ms. Lee's proposed hourly rate (HK$3000); and (2) Ms. Lee's declaration of acceptance and statement of availability, impartiality and independence. Parties were invited to comment on the proposed appointment. The said letter was sent to the Claimant's Counsel and the Respondent in the same manner described in Paragraph 15 above.

17.  On 18 October 2021, the HKIAC by its letter indicated the formal appointment of Ms. Connie Lee as the sole arbitrator. The said letter was sent to the Claimant's Counsel and the Respondent in the same manner described in Paragraph 15 above.

18.  By reason of the foregoing, the Arbitral Tribunal was duly constituted.

19.  On 15 November 2021, the HKIAC transmitted the case file to the Arbitral Tribunal having received the initial payments of fees and deposits in the total sum of HK$147,833.20 to be described in **section D2** below.

**D2.  Payments of Fees and Deposits**

20.  On 30 July 2021, the Claimant paid HK$8,000 to the HKIAC as the registration fees pursuant to Article 4.4 of the Rules.

21.  On 2 September 2021, the HKIAC requested payments of the initial deposits for (1) the fees and expenses of the Arbitral Tribunal (HK$200,000); and (2) the HKIAC's Administrative Fees (HK$79,666.33). The said two sums were to be shared equally by the Claimant (50%) and the Respondent (50%).

22.  By letter dated 7 September 2021, the HKIAC acknowledged receipt of the 50% share of the aforesaid two sums (i.e. HK$139,833.20) paid by the Claimant. The Respondent had not paid their share.

23.  On 18 October 2021, in the light of the Respondent not paying their share of the initial deposits, the HKIAC indicated that either side might make payment of the Respondent's share.

24.  By letter dated 18 October 2021, the Claimant's counsel requested the HKIAC to consider proceeding with the reference on the basis of the deposits already paid by the Claimant. The Claimant also accepted that if, at any time, it appeared as though the deposits already paid are close to being used up, the HKIAC and the Arbitral Tribunal would be fully entitled to require payment of the Respondent's share of the deposits and that that the Claimant would need to pay the Respondent's share in those circumstances.

25.  On 15 November 2021, the HKIAC informed the parties that in light of the circumstances of the case and having consulted with the Arbitral Tribunal, it had determined to transfer the case file to the Arbitral Tribunal.

26. On 29 April 2022, the HKIAC requested payments of supplementary deposit for the fees and expenses of the Arbitral Tribunal in the amount of HK$60,000. The said sum was to be shared equally by the Claimant (50%) and the Respondent (50%).

27. By letter dated 5 May 2022, the Claimant informed the HKIAC that the Claimant's share of the supplementary deposit in the sum of HK$30,000 had been paid. The Respondent had not paid their share.

28. By letter dated 13 June 2022, the HKIAC acknowledged receipt of the Respondent's share of the initial deposit for the HKIAC's Administrative Fees (i.e. HK$39,883.20) paid by the Claimant.

29. As of the date of this Final Award, the Respondent's share of the initial and supplementary deposits for the fees and expenses of the Arbitral Tribunal(i.e. HK$130,000) remains unpaid. The Claimant only paid the total sum of HK$217,666.40, of which HK$8,000 was spent on the registration fee; and HK$79,666.40 on the the HKIAC administration fee.

### D3.  Procedure

30. On 18 November 2021, the Arbitral Tribunal by way of letter confirmed that the arbitral proceedings shall be conducted in accordance with the Expedited Procedure under Article 42 of the Rules. Besides, the Arbitral Tribunal took notice that the Respondent had failed to communicate their Answer to the Notice as requested by the HKIAC without showing cause for such failure.

31. Further, the Arbitral Tribunal, in the aforesaid letter invited the parties' comments on the Draft Procedural Order No. 1 and the proposed Provisional Timetable.

32. On 23 November 2021, the Claimant, through the Claimant's Counsel, submitted their comment. They took notice that the proposed Provisional Timetable made provision for the Respondent to file their Statement of Defence and Counterclaim (if any) within 28 days from the Statement of Claim. They suggested that (1) the time for the Respondent to file their Statement of Defence and Counterclaim (if any) be shortened to 14 days; and (2) the Provisional Timetable should make it clear that the deadline for each step following the Statement of Claim would be determined by reference to when the preceding step would be taken. Save for the aforesaid, the Claimant had no objection to the Draft Procedural Order No. 1 and the proposed Provisional Timetable.

33. With respect to the Respondent, the Arbitral Tribunal has not received any response from them.

34. On 29 November 2021, the Arbitral Tribunal by letter indicated that it would only be fair that both parties should be entitled to 14 days to file their respective Statement of Claim and Statement of Defence and Counterclaim (if any).

35. The Arbitral Tribunal is satisfied that its letter dated 18 November 2021 together with the Draft Procedural Order No 1 had been successfully served on the Respondent and decided to continue the arbitral proceedings despite the lack of response from the Respondent. The Arbitral Tribunal accordingly issued the Procedural Order No. 1 dated 29 November 2021.

36. The Procedural Order No. 1 dated 29 November 2021 confirmed the seat of the arbitration is in Hong Kong and Clause 14 of the Agreement provides that the Agreement shall be governed by the laws of Hong Kong. It further confirmed that the language of the arbitration shall be English.

37. According to the Procedural Order No. 1 dated 29 November 2021:-

   (1) all future correspondence shall continue to be delivered to (a) the Respondent's Address; (b) the Respondent's fax number provided i.e. +86 573 8905 2333; and (c) the email address provided by the Claimant. The Claimant also agreed to communicate with the Arbitral Tribunal by email only;

   (2) each party had 14 days to file their respective Statement of Claim and Statement of Defence and Counterclaim (if any).

38. The Procedural Order No. 1, together with the Arbitral Tribunal's letter dated 29 November 2021, were delivered to the Claimant's Counsel and the Respondent. All deliveries were successfully made.

39. By email dated 13 December 2021 and copied to the Respondent at the email address set out in **Section A2** above, the Claimant's counsel sought an extension of 7 days to serve their Statement of Claim. The time extension (if granted) would result in a new deadline of 20 December 2021.

40. By letter dated 13 December 2021 delivered in the manner set out in Paragraph

8

37(1) above, the Arbitral Tribunal indicated that unless the Respondent was to object by 14 December 2021, the Claimant's application for a short extension of time to serve their Statement of Claim would be acceded to.

41.  The Arbitral Tribunal did not receive any objection from the Respondent by the prescribed deadline and it received the Claimant's Statement of Claim and attachments thereto which included a witness statement of a Mr. Timothy J. Britton on 20 December 2021. Upon the Arbitral Tribunal's further directions to the parties on 11 January 2022, 8 March 2022, 27 April 2022 and 6 May 2022, the Arbitral Tribunal further received from the Claimant (but not the Respondent) on 1 February 2022, 6 April 2022, 3 May 2022 and 13 May 2022 written submissions and clarifications on final relief including the loss and damage for breach of contract (if any), costs and interest together with their statement of costs and other enclosures. The Claimant is seeking legal costs and expenses against the Respondent in the total sum of US$53,538.77 (i.e. US$53,262.50 as legal costs and US$276.27 as disbursements). In addition, the Claimant is also seeking to recover the HKIAC registration and administrative fees as well as the Arbitral Tribunal's fees from the Respondent.

42.  As the arbitral proceedings is conducted under the Expedited Procedure, the time limit for issuing the Final Award herein (including costs) was 16 May 2022. On 3 May 2022, the Claimant sought to correct the figures set out in the witness statement for the purpose of quantifying part of its claim (to be described in **section E4** below). The Arbitral Tribunal raised some enquiries in view of the latest figures and provided a time-line of 14 days each for both the Claimant and the Respondent to address the same.

43.  As a result of which, the Arbitral Tribunal requested to extend the time limit of 16 May 2022. The Claimant indicated that it has no objection to such request. By letter dated 16 May 2022, the HKIAC extended the time limit for the Arbitral Tribunal to issue the Final Award herein to 16 July 2022.

44.  Insofar as the Respondent is concerned, the Arbitral Tribunal has received neither submissions nor communication from the Respondent.

E.    **BACKGROUND TO THE PARTIES' DISPUTE**

45.  The following overview is not intended to be exhaustive, but rather, is a chronological summary of facts regarding the background to the parties' dispute, based primarily upon the submissions and materials received by the Arbitral Tribunal.

**E1.   The Agreement**

46.   The Claimant is engaged in the business of both leasing and selling new and used shipping containers. On the other hand, the Respondent is engaged in the manufacture of shipping containers.

47.   On or around 7 August 2019, the Claimant and the Respondent entered into the Agreement by which the Claimant agreed to purchase from the Respondent and the Respondent agreed to sell marine cargo containers of various types and sizes to be manufactured by the Respondent as described in the applicable purchase order.

48.   It should be noted that the Agreement would be incorporated into any purchase order issued by the Claimant to the Respondent when incorporated by the terms of such purchase order. After the first such incorporation, the Agreement would be incorporated in any subsequent purchase order unless otherwise provided in that subsequent purchase order.

49.   The parties agreed under Clause 5 of the Agreements that:-

(1)   It would be impracticable or extremely difficult to fix the actual damage arising from the Respondent's failure to deliver the containers. Therefore, in the event Respondent fails to make any of the containers ready for delivery within 15 days after the end of the contractual month in which any such container is scheduled to be produced and delivered, except for reasons of Force Majeure as defined in Clause 12, then the Respondent shall be liable to the Plaintiff for liquidated damages at the rate of US$5.0 for each 20' Dry Container (or as otherwise set forth in the applicable purchase order) until the day on which the Respondent makes each such container ready for delivery. If the containers, or any of them, have not been made so ready for delivery by 15 days after the end of the scheduled production month, whether for reason of Force Majeure or otherwise, the Plaintiff may, at its sole option, terminate this Agreement with respect to any undelivered containers by seven (7) day's notice in writing without prejudice to any other rights and remedies then or thereafter available to the Plaintiff hereunder or otherwise (Clause 5(a));

(2)   Liquidated damages payable under this Clause shall be in addition to, and not in lieu of, any damages to which the Plaintiff may be entitled if this

10

Agreement is terminated due to the Respondent's default, and the Plaintiff's rights and remedies shall in no way be diminished or impaired by reason of the inclusion of the foregoing liquidated damages provision in this Agreement (Clause 5(b)).

50. According to Clause 7(a) of the Agreement, production report to inform the Plaintiff of the production schedule should be made available a minimum of 10 days prior to the production date.

## E2.   The March, May and July 2021 Purchase Orders

51. On 24 February 2021, the Claimant placed and the Respondent accepted a series of purchase orders (i.e. 63 set of purchase orders) for containers to be delivered in the month of March 2021 (the "**March 2021 Pos**") which provide that production would have to be completed by end of March 2021.

52. According to the Claimant, whilst some of the containers set out in the March 2021 Pos were manufactured and delivered by the Respondent during March and April 2021, the units set out in 43 sets of the March 2021 Pos were not, and have never been, manufactured or made ready for delivery.

53. On 1 March 2021, the Claimant also placed and the Respondent accepted a series of purchase orders (i.e. 26 set of purchaser orders) for containers to be delivered in the month of May 2021 (the "**May 2021 Pos**") which provide that production would have to be completed by 31 May 2021.

54. On 3 March 2021, the Claimant again placed and the Respondent accepted a series of purchase orders (i.e. 15 sets of purchase orders) for containers to be delivered in the month of July 2021 (the "**July 2021 Pos**") which provide that production would have to be completed by 31 July 2021.

55. Each of these purchase orders expressly incorporated the terms of the Agreement i.e. it would be "in accordance with terms + conditions of Purchase and Sales Agreement ref. SES-POCS-2019".

## E3.   The Respondent's Failure to Perform the Agreement

56. It is the Claimant's case that the Respondent has failed to manufacture or make ready for delivery, whether on time or at all, any of the containers set out in the 43 sets of the March 2021 Pos referred to Paragraph 52 above (the "**Undelivered**

March 2021 Pos"), the May 2021 Pos and the July 2021 Pos (collectively, the "**Undelivered Units**"). The particulars of the Undelivered Units are briefly summarised as follows:-

| March 2021 Pos | May 2021 Pos | July 2020 Pos |
|---|---|---|
| Total outstanding 20' dry containers: 1946 units | Total outstanding 20' dry containers: 1186 units | Total outstanding 20' dry containers: 1000 units |
| Total outstanding 40' containers: 668 units | Total outstanding 40' containers: 259 units | Total outstanding 40' containers: 50 units |

57.  Amongst the Undelivered Units, there are a total of 4132 units of 20' dry containers and a total of 977 non 20' dry containers.

**E4.   Relief Sought By The Claimant**

58.  In the premises, the Claimant prays for the following relief:-

(1)   A declaration that the Respondent remains obliged to manufacture and make ready for delivery the Undelivered Units;

(2)   Liquidated damages for the 20' dry containers due for delivery in March 2021, May 2021 and July 2021 accrued as at 15 December 2021 in the total sum of US$4,080,240 as invoiced by the Claimant;

(3)   Alternatively, damages in such sum as the Arbitral Tribunal sees fit;

(4)   Costs;

(5)   Interests including post-award interest; and

(6)   Such further or other relief as the Arbitral Tribunal sees fit to grant.

59.  The Claimant further asks the Arbitral Tribunal to reserve its jurisdiction as to other matters, including but not limited to:-

(1)   Any claim for further liquidated damages which may accrue in future;

(2)   Any claim for damages for delayed delivery of the 40' units;

(3) Any claim for damages for non-delivery, in the event that the Respondent ultimately never manufactures and makes ready for delivery the Undelivered Units.

60. By further written submissions dated 6 April 2022, the Claimant clarifies that if the Arbitral Tribunal is to take the view that it should not grant the declaratory relief sought, nor, therefore, reserve its jurisdiction as to various other matter referred to in Paragraph 59 above, the relief sought as set out in the Notice and the Statement of Claim is as follows:-

(1) Liquidated damages for the 20' dry containers due for delivery in March 2021, May 2021 and July 2021 accrued as at 15 December 2021 in the total sum of US$4,080,240;

(2) Damages for delayed delivery of the Undelivered Units other than 20' dry containers units (i.e. the 40' units) in the sum of US$1,835,268;

(3) Damages for non-delivery of all of the Undelivered Units in the sum of US$13,058,528;

(4) Interests including post-award interest; and

(5) Costs.

61. By submissions dated 3 May 2022, the Claimant corrected the figures in respect of the damages claimed for non-delivery of the Undelivered Units. According to the Claimant's revised calculation, such damages is said to be in the sum of US$10,693,184 which is made up of:-

(1) US$5,923,372 being loss of income from re-selling the containers; and

(2) US$4,769,812 being loss of one way lease income.

**E5.  The Respondent's Defences**

62. The Respondent has not filed any submissions and therefore the Arbitral Tribunal is unable to ascertain the defence that the Respondent seeks to raise.

63. The Respondent has not made any counterclaim(s) against the Claimant.

**F.    RESPONDENT'S NON-PARTICIPATION IN THE ARBITRATION**

64.    As stated above, the Respondent has not been responsive to the present arbitral proceedings. They have filed neither the Answer nor any submissions on defence and/or costs.

65.    The Arbitral Tribunal refers to Section 53(1) of the Arbitration Ordinance Cap. 609 (the "**Ordinance**") which adopts Article 25 of the UNCITRAL Model Law on International Commercial Arbitration (1985 version as amended in 2006) (the "**Model Law**"):-

"Unless otherwise agreed by the parties, if, without showing sufficient cause

...

(b) the respondent fails to communicate his statement of defence in accordance with article 23(1), the arbitral tribunal shall continue the proceedings without treating such failure in itself as an admission of the claimant's allegations;

..."

66.    The Arbitral Tribunal further refers to Articles 26.2 and 26.3 of the Rules:-

"26.2 If, within the time limit set by the arbitral tribunal, the Respondent has failed to communicate its written statement without showing sufficient cause for such failure, the arbitral tribunal may proceed with the arbitration.

26.3 If one of the parties, duly notified under these Rules, fails to present its case in accordance with these Rules including as directed by the arbitral tribunal, without showing sufficient cause for such failure, the arbitral tribunal may proceed with the arbitration and make an award on the basis of the evidence before it."

67.    The Respondent has not shown any cause as to why it has not filed the Answer and/or any submissions in accordance with the Procedural Order No. 1. However, before the Arbitral Tribunal decides to proceed with the arbitration and to make an award on the basis of the evidence before it, it has to satisfy itself that proper notice of (1) the appointment of the arbitrator; and (2) the arbitral proceedings have been given to the Respondent.

**F1.    Applicable Rules on "Notice"**

68.    Insofar as notice is concerned, the Arbitral Tribunal refers to Section 10 of the Ordinance, which adopts Article 3 of the Model Law:-

"(1) Unless otherwise agreed by the parties:

(a) any written communication is deemed to have been received if it is delivered to the addressee personally or if it is delivered at his place of business, habitual residence or mailing address; if none of these can be found after making a reasonable inquiry, a written communication is deemed to have been received if it is sent to the addressee's last-known place of business, habitual residence or mailing address by registered letter or any other means which provides a record of the attempt to deliver it;

(b) the communication is deemed to have been received on the day it is so delivered.

69. In this respect, Clause 16 of the Agreement provides that:-

"All notices required to be given by either party shall be in writing and shall be airmailed, telexed or cabled, to the address first stated above, except as may otherwise be provided in any purchase order, or at such other address as such party may hereafter from time to time designate in writing and shall be deemed received, in the case of airmail, five days after it is postmarked, and in the case of telex, upon transmission (with answer back confirmed) to the other party's telex facilities."

70. The Arbitral Tribunal further refers to Articles 3.1 to 3.3 of the Rules:-

"3.1. Any written communication pursuant to these Rules shall be deemed to be received by a party, arbitrator, emergency arbitrator or HKIAC if: **(a)** communicated to the address, facsimile number and/or email address communicated by the addressee or *its representative in the arbitration*; or **(b)** in the absence of (a), communicated to the address, facsimile number and/or email address specified in any applicable agreement between the parties; or **(c)** in the absence of (a) and (b), communicated to any address, facsimile number and/or email address which the addressee holds out to the world at the time of such communication;                                        or **(d)** in the absence of (a), (b) and (c), communicated to any last known address, facsimile number and/or email address of the addressee; or **(e)** uploaded to any secured online repository that the parties have agreed to use.

"3.2 If, after reasonable efforts, communication cannot be effected in accordance

with Article 3.1, a written communication is deemed to have been received if it is sent to the addressee's last-known address, facsimile number and/or email address by means that provides a record of attempted communication."

"3.3 Any written communication shall be deemed received on the earliest day when it is communicated pursuant to paragraphs 3.1(a) to (d), uploaded pursuant to paragraph 3.1(e), or attempted to be communicated pursuant to Article 3.2. For this purpose, the date shall be determined according to the local time at the place of receiving such written communication or a notice of the upload pursuant to paragraph 3.1(e)."

## F2.   Notice of The Arbitral Proceedings

71.   The Arbitral Tribunal refers to Paragraphs 8 and 9 above. In light of what is set out therein, which is supported by the documentary evidence provided by the Claimant, the Arbitral Tribunal is satisfied that the Notice and the enclosures therein have been duly delivered to the Respondent on 30 July 2021 and 2 August 2021.

## F3.   Notice of Appointment of the Sole Arbitrator

72.   The Arbitral Tribunal refers to Paragraphs 13 to 19 above.

73.   All correspondence concerning (1) the HKIAC's intention to appoint the sole arbitrator pursuant to Article 7.2 of the Rules; (2) the HKIAC's proposed appointment of Ms. Connie Lee as the sole arbitrator; and (3) the formal appointment of Ms. Connie Lee have been sent to the Respondent's Address and fax number as well as email address provided by the Claimant.

74.   By the deeming provision under Article 3(1)(b) of the Model Law and/or Article 3.3 of the Rules and/or Clause 16 of the Agreement, the Respondent is deemed to have received the aforesaid correspondence.

## F4.   Notice of the Procedural Order No. 1

75.   The Arbitral Tribunal refers to Paragraphs 30 to 44 above. By reason of what is set out therein, the Arbitral Tribunal is satisfied that the Procedural Order No. 1 has been duly delivered to the Respondent.

## F5.   Conclusion on Notice

76. The Arbitral Tribunal is satisfied that due notices of (1) the arbitral proceedings; (2) the appointment of the sole arbitrator; and (3) the Procedural Order No. 1 have been given to the Respondent.

77. Further, all deliveries of (1) the letter dated 11 January 2022 inviting the parties to submit and exchange written submissions on final relief, costs and interest together with legal authorities (if any) and Statement of Costs; (2) the letter dated 8 March 2022 inviting the parties for further submissions and an updated Statement of Costs; (3) the letter dated 21 March 2022 indicating to the parties that unless the Arbitral Tribunal was to receive any objection, an extension of 14 days would be granted to the Claimant to submit and serve its further submissions; (4) the letter dated 25 April 2022 informing the parties that pursuant to Article 42.2(e) of the Rules, the Arbitral Tribunal shall then proceed to decide the dispute on the basis of documentary evidence available only, and (5) directions for the parties to address the Arbitral Tribunal's enquiries dated 27 April 2022 and 6 May 2022 were successfully made to the Claimant and the Respondent (by courier to the Respondent's Address and/or by email).

78. The Respondent has not shown cause for their failure to provide the Answer and/or any submissions in accordance with the Procedural order No. 1 and further directions issued by the Arbitral Tribunal referred to above. Hence the Arbitral Tribunal decides to proceed with the present arbitral proceedings and to make this Final Award on the basis of the evidence before it.

79. The Arbitral Tribunal, in adopting the course stated in the foregoing paragraph, reminds itself that it has no authority to issue an award akin to a default judgment. Instead, the Arbitral Tribunal is obliged, even where the Respondent has failed to present its case, to consider the merits and make a determination of the substance of the dispute.

80. Accordingly, the burden remains on the Claimant to prove its case to the satisfaction of the Arbitral Tribunal. The Arbitral Tribunal has no duty to act as advocate for the absent Respondent but must examine the merits of the arguments of law and fact put to it by the Claimant, so as to satisfy itself that these are well founded.

## G.    THE ARBITRAL TRIBUNAL'S OBSERVATION ON ITS JURISDICTION

81. In light of the Respondent's non-participation in the arbitration, there has not been

any objection to the jurisdiction of the Arbitral Tribunal. The Arbitral Tribunal has, nevertheless, considered the issue of jurisdiction, and has reached the conclusion that there are no facts or circumstances on record in this case which could cast any doubt on its jurisdiction.

82.    The arbitration agreement relied upon by the Claimant is set out in Clause 14 of the Agreement. The Arbitral Tribunal finds that the arbitration agreement in clause 14 is clear and unambiguous, and that the Agreement was signed and executed by the Claimant and the Respondent. The Arbitral Tribunal further finds that the Claimant's claims fall squarely within the scope of the arbitration agreement.

83.    It is further noted that the Arbitral Tribunal was validly constituted in accordance with the parties' arbitration agreement, the Rules and/or the Ordinance.

## H.    THE ARBITRAL TRIBUNAL'S DISCUSSION AND CONCLUSION

### H1.    Whether The Respondent Was In Breach of the Agreement

84.    The Arbitral Tribunal has examined the evidence provided by the Claimant and is satisfied that the Claimant had placed and the Respondent had accepted a series of purchase orders for containers to be delivered in the month of March 2021, May 2021 and July 2021.

85.    Based on the evidence available, the Arbitral tribunal finds that the Claimant has made out the case that the Respondent has been in breach of the Agreement in failing to manufacture or made ready for delivery any of the containers set out in the Undelivered March 2021 Pos, the May 2021 Pos and the July 2021 Pos.

86.    First, the Claimant has produced documentary evidence showing that the parties had executed the Agreement dated 7 August 2019.

87.    Second, the Claimant has also produced the relevant purchase orders indicating that the Claimant had placed and the Respondent had accepted the series of purchase orders for containers to be delivered in the month of March 2021, May 2021 and July 2021.

88.    Third, pursuant to Clause 7(a) of the Agreement, the Respondent as seller should provide production report to inform the Claimant of the production schedule a minimum 10 days prior to the production date. However, according to the parties' correspondence exchanged during the period from March to July 2021, it is clear

that the Respondent acknowledged the delay in production and proposed various revised production schedules.

89.   Fourth, on the Claimant's case, by 12 July 2021, the Respondent again indicated that it could not comply with the revised production proposal and it was said that the best the Respondent could do was to complete production of all remaining balance of 6086 units in the month of December 2021. Nevertheless, the Respondent still failed to deliver any of the Undelivered Units by December 2021 and no further or subsequent agreement had been reached by the parties.

90.   Apart from liquidated damages for the 20' dry containers due for delivery in March 2021, May 2021 and July 2021 accrued as at 15 December 2021 (i.e. in the total sum of US$4,080,240), the Claimant in the Statement of Claim also seeks:-

   (1)   a declaratory relief that the Respondent remains obliged to manufacture and make ready for delivery the Undelivered Units; and

   (2)   to reserve their right to claim further liquidated damages for delayed delivery which may accrue in future.

91.   In the circumstances where the Claimant put forward evidence which shows that the Respondent is not willing nor in the position to make ready for delivery of the Undelivered Units, the Claimant no longer has any legitimate interest to keep the Agreement alive in the hope of future performance. The Arbitral Tribunal is not satisfied that a declaration sought by the Claimant should be made.

**H2.   The Claimant's Claim For Liquidated Damages In The Sum of US$4,080,240**

92.   Given the Arbitral Tribunal has found that the Respondent had failed to manufacture or make ready for delivery any of the containers set out in the Undelivered March 2021 Pos, the May 2021 Pos and the July 2021 Pos, the Claimant is entitled to the claim for liquidated damages for the 20' dry containers accrued and invoiced as at 15 December 2021 in the total sum of US$4,080,240.

93.   First, the same is expressly and specifically provided for under Clause 5(a) of the Agreement. Further, pursuant to Clause 5(b), the same shall be in addition to, and not in lieu of, any damages to which the Buyer (i.e. the Claimant) may be entitled if the Agreement is terminated due to the Seller (i.e. the Respondent)'s default, and the Claimant's rights and remedies shall in no way be diminished or impaired by reason of the inclusion of the foregoing liquidated damages provision in the

19

Agreement.

94. Second, for reasons set out in Paragraph 89 above, the Arbitral Tribunal agrees with the Claimant's submissions that the cut off date for the claim for liquidated damages should be 15 December 2021. By then, it was clear that the Respondent either had no intention or ability to comply with its obligation under the Agreement to produce and/or deliver the Undelivered Units.

95. Third, according to the evidence of Mr. Timothy Britton ("**Mr. Britton**") which is not challenged, the Claimant had stopped invoicing further liquidated damages for the 20' dry containers by December 2021 as it had reluctantly accepted that the Respondent had no intention of performing its obligations.

96. Fourth, the Arbitral Tribunal is satisfied that the liquidated damages accrued and invoiced amounted to US$4,080,240 as particularized in the Statement of Claim at Paragraphs 21 to 34. The Claimant has also produced the relevant invoices setting out the calculation of the same.

97. Therefore, the Arbitral Tribunal awards the sum of US$4,080,240 to the Claimant.

### H3.    The Claimant's Claim for Damages for Delayed Delivery of the Undelivered 40' Units

98. However, the same cannot be said for the claim for damages for delayed delivery of the Undelivered 40' Units.

99. In this respect, the Claimant seeks to persuade the Arbitral Tribunal to apply the Costs Equivalent Units ("CEUs") to the daily liquidated damages rate of US$5/unit agreed in Clause 5(a) of the Agreement.

100. The Claimant further contends that on this basis, the daily rate for 40' dry containers, 40' High Cube units and 40' High Cube Double Door units would respectively be US$8, US$8.50 and US$9.10.

101. Having adopted the aforesaid rates and the cut off date of 15 December 2021, the Claimant comes up with a calculation in the total sum of US$1,835,268

102. As the Claimant accepts, the liquidated damages regime set out in Clause 5(a) of the Agreement has not set a pre-agreed rate for 40' units. The fact that the CEUs may be widely used in the industry as the basis for pricing negotiations between

20

manufacturers and purchasers of containers is neither here nor there. There is no evidence that the parties had agreed to adopt a pre-agreed rate for 40' units whether in the Agreement or the relevant purchase orders for late delivery.

103. The Arbitral Tribunal is therefore not persuaded that the Claimant is entitled to payment of the same.

### H4.    The Claimant's Claim for Damages For Non-Delivery of The Undelivered Units

104. The Claimant also claims damages for non-delivery of the Undelivered Units. It *is trite that the measure of damages for non-delivery is the estimated loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract*: section 53(2) of the Sale of Goods Ordinance Cap. 26.

105. In this respect, the Claimant claims damages for loss of (1) re-sale income ("**Re-sale Income**") particularized in the sum of US$5,923,372 and (2) additional income for leasing the containers to users whilst they are in transit from where they are manufactured to where they are delivered which is said to be US$4,769,812 ("**One Way Lease Income**").

106. The Claimant contends and the Arbitral Tribunal agrees that there was no "available market" in assessing damages for non-delivery at the time, in March, May and July 2021, i.e. when the Respondent failed to deliver:-

    (1)    First, the containers were to be manufactured specially to suit the particular requirements or specifications of the Claimant. It is most unlikely that there would be an available market in which it could buy suitable substitute goods: **Benjamin's Sale of Goods** (11th Ed.) at §17-006.

    (2)    Second, as referred to by industry analysists, Drewry, in their report produced by the Claimant, factories in the PRC which manufacture containers *were completely booked up until the end of 2021* and there was a global shortage of shipping containers.

107. For these reasons, the Claimant also submits, and the Arbitral Tribunal agrees that it was not unreasonable for the Claimant not to order substitute goods. In particular, it was open for the Claimant to claim liquidated damages (at least insofar as the 20' units are concerned) whilst waiting for the Respondent to perform its obligation as it had at one stage indicated it would do so.

21

Claim for Loss of Re-sale Income

108. On the aforesaid basis and in the absence of relevant re-sale contracts in place as the Claimant's case is that the same would only be fixed once the units have actually been manufactured, the Arbitral Tribunal agrees that the loss of Re-sale Income would be best assessed by a comparison of contract price of the Undelivered Units with the market price of the same units for Q4 2021.

109. According to Mr. Britton's evidence contained in his 2nd Witness Statement which is not challenged, the market prices for the Undelivered Units are derived from the industry data produced by Drewry. In this respect, the Claimant has:-

    (1) produced the Drewry's report which set out the respective finished prices for newbuild dry freight standard containers for Q4 2021 and the CEU ratio for a standard 20' DC, 40' DC and 40' HC;

    (2) adopted the finished price of US$3,735 for a "baseline" 20' DC unit and applied the same to that the various CEUs ratio i.e. 20'OS – 1.51; 20'HCOS -1.55; 40'DC -1.6; 40'HC – 1.7 and 40'HCDD -1.82.

110. Insofar as the contract price is concerned, the Claimant adopts the weighted average purchase agreement price ("**WA Price**") which is calculated based on the total sum of (units ordered under each purchase order times purchase order price for the corresponding purchase orders) divided by the total number of units ordered for that type of containers. The Claimant submits and the Arbitral Tribunal is satisfied that the use of the weighted average approach is convenient for the purpose of calculating the contract prices taking into account the different types of containers and their different agreed prices.

111. The Arbitral Tribunal is satisfied that the difference between the contract price of the Undelivered Units and the market price of the same units for Q4 2021 amounted to US$5,923,372. The same has been particularised by the Claimant as follows:-

    (1) The respective differences between the contract price and the market price for each type of the Undelivered Units:-

| Unit Type | Weighted Average Purchase Agreement Price (USD) | Market Price – Q4 2021 (USD) | Difference between Purchase Agreement Price and Market Price USD) |
|---|---|---|---|
| 20' DC | 2723 | 3735 | 1012 |
| 20' OS | 3300 | 5640 | 2340 |
| 20' HCOS | 3718 | 5789 | 2071 |
| 40' DC | 4370 | 5976 | 1606 |
| 40' HC | 4668 | 6350 | 1682 |
| 40' HCDD | 4917 | 6910 | 1993 |

(2)  The respective differences between the contract price and the market price for each type of the Undelivered Units to be multiplied by the number of units of each type of the Undelivered Units:-

| Unit Type | Difference between Purchase Agreement Price and Market Price USD) | No. of Units | Price Differential x No. of Units (USD) |
|---|---|---|---|
| 20' DC | 1012 | 4068 | 4,116,816 |
| 20' OS | 2340 | 54 | 126,360 |
| 20' HCOS | 2071 | 10 | 20,710 |
| 40' DC | 1606 | 311 | 499,466 |
| 40' HC | 1682 | 538 | 904,916 |
| 40' HCDD | 1993 | 128 | 255,104 |
| TOTAL | - | 5109 | 5,923,372 |

Claim for Loss of One Way Lease Income

23

112. The Arbitral Tribunal is not satisfied that the Claimant has discharged their burden of proof for the claim in respect of the loss of One Way Lease Income which is said to be in the sum of US$4,769,812.

113. In particular, the Claimant only relies on one paragraph in Mr. Britton's 2nd Witness Statement to suggest an average for the One Way Lease Income generated by each unit it received from other suppliers in the PRC was US$933.61 per unit during the year of 2021:-

    (1)    The said figure is then multiplied by the total number of Undelivered Units to derive the figure of US$4,769,812 which is said to be the loss of One Way Lease Income suffered by the Claimant as a result of the non-delivery of the Undelivered Units.

    (2)    However, the Claimant has not produced any document to verify the so-called average for the One Way Lease Income generated by each other unit it received from other suppliers.

114. The Claimant also acknowledges that it is not possible to know what voyage each and every unit left un-delivered by the Respondent would have been deployed on.

## I.    COSTS

115. The Claimant also seeks costs and expenses of the arbitration and has submitted two statements of costs. The Respondent has not responded to the said submission or statements.

### I1.    General Principles

116. Article 34 of the Rules provides that:-

"34.1 The arbitral tribunal shall determine the costs of the arbitration in one or more orders or awards. The term "costs of the arbitration" includes only:-

(a) the fees of the arbitral tribunal, as determined in accordance with Article 10...
(d) the reasonable costs for legal representation and other assistance, including fees and expenses of any witnesses and experts, if such costs were claimed during the arbitration; and
(e) the Registration Fee and Administrative Fees payable to HKIAC in accordance

with Schedule 1, and any expenses payable to HKIAC.

34.2 With respect to the costs of legal representation and other assistance referred to in Article 34.1(d), the arbitral tribunal, taking into account the circumstances of the case, may direct that the recoverable costs of the arbitration, or any part of the arbitration, shall be limited to a specified amount.

34.3 The arbitral tribunal may apportion all or part of the costs of the arbitration referred to in Article 34.1 between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case."

117. Thus, pursuant to Article 34 of the Rules, the Arbitral Tribunal shall determine the costs of the arbitration and apportion all or part of the costs of the arbitration between the parties in the award, if the Arbitral Tribunal determines that apportionment is reasonable, taking into account the circumstances of the case.

## I2.  The HKIAC Registration and Administrative Fee

118. The HKIAC charged a registration fee of HK$8,000 (see Paragraph 20 above).

119. In addition, the HKIAC charged the administrative fee in the sum of HK$79,666.40 which the Claimant had paid both parties' share (see Paragraphs 22 and 28 above).

## I3.  Fees and Expenses of the Arbitral Tribunal

120. The fees and expenses of the Arbitral Tribunal are as follows:-

  (1)  Fees of Ms. Connie Lee: HK$120,000 (40 hours x HK$3000 per hour)
  (2)  Expenses of Ms. Connie Lee: HK$1380.32 (i.e. HK$1364.62 being courier fees and HK$15.7 being IDD fees)

121. Thus, the Arbitral Tribunal's fees and expenses in these arbitral proceedings amount to a total sum of HK$121,380.32.

122. The Arbitral Tribunal's fees and expenses shall be paid out of the deposits held by the HKIAC and any unexpended balance shall be returned to the Claimant.

## I4.  Reasonable Costs for Legal Representation and Assistance

25

123. The Claimant has submitted a claim for costs under this head in the sum of US$53,538.77. Out of the said sum of US$53,538.77, the Claimant seeks costs against the Respondent in the sum of US$53,262.50 as legal costs and US$276.27 as disbursements.

124. Having considered the complexity of the case and the fact that the Respondent has not participated in the arbitration, the Arbitral Tribunal considers appropriate to apply 5% discount on the legal fees claimed (i.e. US$50,599.40. after discount).

125. With respect to the disbursements, the Arbitral Tribunal considers such claims reasonable and allows them in full.

126. In the premises, the Arbitral Tribunal fixes the Claimant's reasonable costs for legal representation and disbursements to be US$50,875.67.

127. The Respondent has not submitted any claim for costs.

## I5.  Allocation of Costs

128. In exercising the power under Article 34.3 of the Rules, the Arbitral Tribunal finds it appropriate to apply the principle "costs follow the event" as the starting point.

129. The Claimant is the overall successful party in this arbitration in that the Arbitral Tribunal has acceded to most of the relief sought. The Arbitral Tribunal does not find any circumstances warranting departure from the said starting point. The Arbitral Tribunal accordingly finds that the Respondent shall bear the costs of the arbitration.

## I6.  Conclusion On Costs

130. By reason of the foregoing, the Arbitral Tribunal hereby fixes the costs of the arbitration to be HK$209,046.72 and US$50,875.67:-

    (1)    The fees and expenses of the Arbitral Tribunal: HK$121,380.32.
    (2)    The Claimant's costs for legal representation and assistance (including disbursements): US$50,875.67;
    (3)    The registration fee paid by the Claimant to the HKIAC: HK$8,000; and
    (4)    The administration fee in the total sum of HK$79,666.40 paid to the HKIAC.

131. The above costs of arbitration shall be borne by the Respondent.

132. For the avoidance of doubt, the Arbitral Tribunal also orders the Respondent is to bear its own costs for legal representation and assistance and other costs, if any.

## J.    PRE-AND POST-AWARD INTEREST
### J1.   Pre-Award Interest

133. The purpose of pre-Award interest is to compensate the innocent party for the loss arising from him being deprived of the use of the monies which he would have received or entitled had the breach not occurred.

134. The Claimant therefore claims and the Arbitral Tribunal is satisfied that it is appropriate to award pre-award interest on the sums or damages awarded to the Claimant.

135. In respect of the liquidated damages in the total sum of US$4,080,240, it would be a complicated process if each sum of US$5 claimed for each 20'unit under the Undelivered March 2021 Pos, May 2021 Pos and July 2021 Pos were to carry interest from a different date. To simplify the process and adopting a broad brush approach, the Arbitral Tribunal would award interest at half of the rate it would otherwise order (i.e. the prevailing HSBC USD best lending rate of 3.25% plus 1%) on the total amount of US$4,080,240 after 16 April 2021 until the date of this Final Award.

136. The Arbitral Tribunal also awards pre-award interest accrue on simple basis at the prevailing HSBC USD best lending rate of 3.25% plus 1% on the sum of US$5,923,372 being damages for the Claimant's loss of Re-Sale Income from 16 December 2021 until the date of this Final Award.

### J2.   Post-Award Interest

137. Different considerations apply to post-award interest, which seeks to encourage early compliance by the paying party with the arbitral award.

138. The Arbitral Tribunal considers appropriate and so awards, post-award interest in respect of (1) the liquidated damages in the total sum of US$4,080,240 and (2) the sum of US$5,923,372 on a simple basis at the judgment rate (i.e. the rate of interest determined by the Chief Justice under section 49(1)(b) (Interest on judgments) of the High Court Ordinance Cap. 4: Section 80(1) and (3) of the Ordinance.

139. The Arbitral Tribunal does not consider appropriate to award post-award interest on the interest awarded (at Paragraphs 135 and 136) but accruing up to the date of the Final Award.

140. The Arbitral Tribunal further awards post-award interest on the costs of arbitration at the aforesaid judgment rate: Section 80(2) of the Ordinance.

## K.    **DISPOSITION AND AWARD**

141. Having carefully considered the submissions, legal authorities and supporting documents available and without having heard from the Respondent despite being given the opportunity to do so, the Arbitral Tribunal HEREBY AWARD AND DIRECT AS FOLLOWS:-

   (1)   It is ordered that the Respondent shall pay the Claimant liquidated damages in the sum of US$4,080,240.

   (2)   It is ordered that the Respondent shall pay the Claimant damages for non-delivery in the sum of US$5,923,372.

   (3)   It is ordered that the Respondent shall pay pre-award interest to the Claimant on the principal amount pursuant to sub-paragraph (1) above (i.e. US$4,080,240) accrued on simple basis at half of 4.25% (i.e. 2.125%) from 16 April 2021 until the date of this Final Award.

   (4)   It is ordered that the Respondent shall pay pre-award interest to the Claimant on the principal amount pursuant to sub-paragraph (2) above (i.e. US$5,923,372) accrued on simple basis at 4.25% from 16 December 2021 until the date of this Final Award.

   (5)   The costs of the arbitration are fixed at HK$209,046.72 and US$50,875.67.

   (6)   The costs of the arbitration shall be borne by the Respondent. It is ordered that the Respondent shall pay the Claimant HK$209,046.72 and US$50,875.67 as compensation for the Claimant's costs of the arbitration.

   (7)   Save and except provided otherwise in the foregoing, no pre-award interest is to be awarded.

   (8)   It is ordered that the Respondent shall pay post-award interest to the

Claimant on (a) the sums awarded in sub-paragraphs (1) and (2) above; and (b) the sums awarded as compensation for the Claimant's cost of the arbitration pursuant to sub-paragraph (6) above, at the rate of interest determined by the Chief Justice under section 49(1)(b) (interest of judgments) of the Hong Kong High Court Ordinance Cap. 4 from the date of this Final Award until full payment is made.

(9)    Save and except provided otherwise under sub-paragraph (8) above, no post-award interest is awarded.

(10)   The Claimant shall be entitled to receive the unexpended balance of the deposit paid to the HKIAC.

(11)   All other claims and requests are dismissed.

MADE AND PUBLISHED by me in Hong Kong Special Administrative Region, being the seat of Arbitration on this 15th day of June 2022.

CONNIE H.Y LEE

Sole Arbitrator

HCCT 9/2023

[2024] HKCFI 1753

## IN THE HIGH COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
## COURT OF FIRST INSTANCE
CONSTRUCTION AND ARBITRATION PROCEEDINGS

NO 9 OF 2023

———————————

BETWEEN

|  |  |
|---|---|
| Pan Ocean Container Suppliers Co., Ltd | Plaintiff |
| and |  |
| Spinnaker Equipment Services Inc. | Defendant |

———————————

Before: Deputy High Court Judge Jonathan Wong in Chambers
(Not Open to Public)

Date of Hearing: 9 April 2024

Date of Judgment: 9 July 2024

———————————

### JUDGMENT

———————————

## 1.   *Introduction*

1.1        This is my judgment and decision on the following applications:

- 2 -

(1)  The Plaintiff's application by its Amended Originating Summons ("**AOS**") for (a) an order that the Award dated 15 June 2022 ("**Award**") in HKIAC/A21141 administered by HKIAC ("**Arbitral Proceedings**") be set aside ("**Section 81 Application**") pursuant to section 81 of the Arbitration Ordinance Cap 609 ("**AO**") and (b) an extension of time be granted for the Section 81 Application ("**EOT Application**"); and

(2)  The Plaintiff's application by its summons dated 3 May 2023 for leave to re-amend the AOS ("**Amendment Application**").

1.2      By an order dated 24 May 2023, the AOS and the Amendment Application were ordered to be heard together[1]. The EOT Application is not opposed by the Defendant[2].

1.3      At the hearing, the Plaintiff was represented by Mr Patrick Chong (with Ms Athena Wong and Mr Han Sheng Lim) and the Defendant by Mr Toby Brown, all of counsel.

1.4      The Plaintiff and the Defendant were respectively the Respondent and the Claimant in the Arbitral Proceedings.

1.5      The Plaintiff is a Mainland company engaged in the manufacture of marine cargo containers. The Defendant is a Californian company engaged in the business of leasing and selling shipping containers.

---

[1]  On 25 September 2023, the parties signed a consent summons for leave to be granted to the Plaintiff to correct a typographical error in the name of the Plaintiff. The consent application was approved by the court's letter dated 28 September 2023 but the AOS and the Amendment Application do not reflect the name change. I proceed on the basis that the Plaintiff's name has been corrected.

[2]  Defendant's Written Submissions §71.

1.6       On or around 7 August 2019, the Plaintiff and the Defendant entered into a purchase agreement (**"Purchase Agreement"**) by which the Defendant agreed to purchase and Plaintiff agreed to manufacture and sell marine cargo containers in accordance with purchase orders to be issued by the Defendant to the Plaintiff from time to time.  Clause 14 thereof is a provision stipulating the applicable law (Hong Kong law) and the dispute resolution mechanism (arbitration in accordance with the rules of HKIAC).

1.7       In early 2021, the Defendant placed and Plaintiff accepted several sets of purchase orders (**"POs"**):

(1)    63 purchase orders on 24 February 2021;

(2)    26 purchase orders on 1 March 2021; and

(3)    15 purchase orders on 3 March 2021.

1.8       Each of the POs incorporates the terms of the Purchase Agreement and stipulates a date on which the production of the containers stated therein had to be completed by the Plaintiff.  Production of the containers covered by the POs placed on 24 February 2021 had to be completed by 31 March 2021, those covered by the POs placed on 1 March 2021 by 31 May 2021 and those covered by the POs placed on 3 March 2021 by 31 July 2021.  The POs cover both 20' and 40' containers of various specifications.

1.9       Clause 5 of the Purchase Agreement is a liquidated damages clause. It provides, *inter alia*, as follows:

> *" [a] ... Therefore, in the event Seller fails to make any of the Containers ready for delivery within 15 days after the end of the contractual month in which any such Container is scheduled to be produced and delivered, except for reasons of Force Majeure as defined in Clause 12, then Seller shall be liable to Buyer for liquidated damages at the rate of USD5.0 for*

> *each 20' Dry Container (or as otherwise set forth in the applicable Purchase Order) until the day on which Seller makes each such Container ready for delivery. If the Containers, or any of them, have not been made so ready for delivery by 15 days after the end of the scheduled production month, whether for reason of Force Majeure or otherwise, Buyer may, at its sole option, terminate this Agreement with respect to any undelivered Containers by seven (7) day's notice in writing without prejudice to any other rights and remedies then or thereafter available to Buyer hereunder or otherwise.*
>
> *[b] Liquidated damages payable under this Clause shall be in addition to, and not in lieu of, any damages to which the Buyer may be entitled if this Agreement is terminated due to Seller's default, and Buyer's rights and remedies shall in no way be diminished or impaired by reason of the inclusion of the foregoing liquidated damages provision in this Agreement."* (emphasis added)

1.10    It is pertinent to note that the provision for liquidated damages is only applicable to 20' Dry Containers.

1.11    The Defendant subsequently claimed that the Plaintiff failed to manufacture or make ready for delivery, whether on time or at all, any of the containers set out in 43 POs (out of the 63) placed on 24 February 2021 and all of the POs placed on 1 March and 3 March 2021 ("**Undelivered Units**"). As summarized at Award §57, amongst the Undelivered Units, 4,132 units were 20' Dry Containers and 977 units were 40' Containers.

1.12    The Arbitral Proceedings were commenced by a Notice of Arbitration dated 30 July 2021 ("**NOA**"). In the NOA, the Defendant applied for a direction for the proceedings to be conducted in accordance with the Expedited Procedure pursuant to Article 42.1 of the 2018 HKIAC Administered Arbitration Rules ("**2018 Rules**"), which application was acceded to by HKIAC on 2 September 2021.

1.13    The Plaintiff did not participate in the Arbitral Proceedings throughout, on the alleged basis that it was not made aware of them. The arbitral tribunal was constituted on 18 October 2021, consisting of a sole arbitrator

("**Tribunal**").    Under the Expedited Procedure, the Award was to be communicated to the parties within 6 months from the date when HKIAC transmitted the case file to the Tribunal. In the present case, as the case file was transmitted to the Tribunal on 15 November 2021, the Award was to be communicated by 16 May 2022. As will be seen below, the Tribunal requested and was granted an extension by HKIAC to 16 July 2022. The Award was published on 16 June 2022, prior to the extended deadline. By the Award, the Defendant was awarded monetary compensation under its claim for liquidated damages in respect of the 20' containers (US$4,080,240) ("**LD Claim (20')**") and for damages for non-delivery of the Undelivered Units (US$5,923,372) ("**Non-Delivery Claim**"), interest and costs[3].

1.14        It is pertinent to note that, although the Plaintiff did not participate in the Arbitral Proceedings, the Tribunal disallowed two substantial claims made by the Defendant for (1) damages quantified at US$1,835,268 for delayed delivery of the 40' containers[4] and (2) damages quantified at US$4,769,812 for loss of one way lease income[5]. Even in respect of the Non-Delivery Claim, the sum awarded was significantly less than that originally claimed by the Defendant, upon clarification requested by the Tribunal's own initiation[6].

1.15        It is the Plaintiff's case that it never received the Award and only found out about it on 2 November 2022 when its bank in the Mainland informed it that its bank account was frozen by an order of the Ningbao Maritime Court, as a result of the Defendant's application made on 10 October 2022 to enforce the Award in the Mainland ("**Mainland Enforcement Proceedings**").

---

[3] Award §§141.
[4] Award §§98-103.
[5] Award §§112-114.
[6] Award §§60-61, 104-114.

- 6 -

1.16      On 2 February 2023, the Plaintiff issued the Originating Summons ("**OS**") to set aside the Award.

## 2.   *The Plaintiff's applications*

2.1      There is a degree of toing and froing in how the Plaintiff has formulated its grounds for the Section 81 Application.

2.2      In the OS (in Chinese), the Plaintiff relied on:

    (1)    Article 34(2)(a)(ii) of the UNCITRAL Model Law ("**Model Law**"), namely it was not given proper notice of the appointment of the Tribunal or of the Arbitral Proceedings or was otherwise unable to present its case ("**Proper Notice Ground**");

    (2)    Article 34(2)(a)(iii) of the Model Law, namely the Award deals with a dispute not contemplated by or falling within the terms of the submission to arbitration, or contains decisions on matters beyond the scope of the submission to arbitration ("**Scope of Arbitration Ground**");

    (3)    Article 34(2)(a)(iv) of the Model Law, namely the composition of the arbitral tribunal or the arbitral procedure was not in accordance with the agreement of the parties ("**Due Procedure Ground**"); and

    (4)    Article 34(2)(b)(ii) of the Model Law, namely the Award is in conflict with Hong Kong public policy ("**Public Policy Ground**").

2.3      No supporting affirmation was filed with the OS.

2.4      The OS was amended on 1 March 2023 pursuant to an order granted on 27 February 2023. The entirety of the OS (in Chinese) was deleted. The AOS

- 7 -

(in English) only advanced the Proper Notice Ground and the Public Policy Ground, abandoning the reliance on the Scope of Arbitration Ground and Due Procedure Ground.  No supporting affirmation was filed at the time of the filing of the AOS.

2.5         The Amendment Application (made on 3 May 2023) seeks to resurrect the Plaintiff's reliance on the Scope of Arbitration Ground and the Due Procedure Ground.  The supporting affirmations (the 1st and 2nd Affirmations of Mr Ye Dao Gen ("**Ye**")) were filed on 2 May 2023.

2.6         I propose to first deal with all the grounds advanced by the Plaintiff, followed by the Amendment Application.  There is a difference between counsel on the proper approach to be adopted in the Amendment Application.  However, I do not believe it was suggested by counsel that the merit of the setting aside grounds is not a relevant consideration in the court's determination of the Amendment Application under either of the approaches advocated by counsel.

## 3.    *Proper Notice Ground*

3.1         It is trite that the grounds for setting aside an award are exhaustively set out at section 81 of AO which gives effect to Article 34 of the Model Law.  Article 34(2)(a)(ii) provides that an arbitral award may be set aside if the party making the application furnishes proof that:

> "*the party making the application was not given <u>proper notice</u> of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case...*" (emphasis added)

3.2         Ye is and was at all material times the Chairman of the Plaintiff and the only deponent for the Plaintiff.  It is Ye's evidence that the Plaintiff did not have *actual or proper* notice of the Arbitral Proceedings: Ye's 1st Affirmation §§5 and 6.  The Plaintiff seeks to demonstrate (1) service was not in accordance

- 8 -

with the 2018 Rules to trigger their deeming effect and (2) even were the deeming provisions triggered, the evidence provided by the Plaintiff has the effect of rebutting them: *Sun Tian Gang v Hong Kong & China Gas (Jilin) Ltd* [2016] 5 HKLRD 221 §§37 and 58 and *AB v CD* [2021] HKCFI 327 §§39-41.

3.3      As summarized at Plaintiff's Skeleton Submissions §33, the Plaintiff contends that the evidence shows the following:

(1)    All relevant physical mails were sent to an "ineffective"[7] address and never reached the Plaintiff's management;

(2)    As confirmed by the Plaintiff's fax service provider China Mobile Communication Group (**"China Mobile"**), the Plaintiff's fax number did not receive any fax from Hong Kong at the material time;

(3)    Instead of sending the relevant emails to the Plaintiff's management (specifically Ye), all relevant emails were sent to a low-ranking employee named Mr Barry Qin (**"Qin"**) who resigned in September 2021 and had no authority to accept service of the NOA or any other written communications in the Arbitral Proceedings on the Plaintiff's behalf.  Qin never brought the Arbitral Proceedings to the attention of the Plaintiff's management;

(4)    As a result, the Plaintiff's management was kept in the dark about the Arbitral Proceedings and did not receive any relevant documents, including but not limited to (a) the NOA, (b) HKIAC's notice that it was minded to appoint a sole arbitrator and (c) the Award.

---

[7] Although Mr Chong had initially contended that the service address was a "wrong" address, he accepted at the hearing it was more appropriate to describe the service address as an "ineffective" address.

- 9 -

*(i)      Whether written communication communicated pursuant to the 2018 Rules*

3.4      Section 10 of the AO (which gives effect to Article 3 of the Model Law), subject to the parties' agreement otherwise, provides:

> " *[(1)] Article 3 of the UNCITRAL Model Law, the text of which is set out below, has effect –*
>
> > ' *Article 3.  Receipt of written communications*
> >
> > > ... *Unless otherwise agreed by the parties:*
> > >
> > > (a)   ... *any written communication is deemed to have been received if it is delivered to the addressee personally or if it is delivered at his place of business, habitual residence or mailing address; if none of these can be found after making a reasonable inquiry, a written communication is deemed to have been received if it is sent to the addressee's last-known place of business, habitual residence or mailing address by registered letter or any other means which provides a record of the attempt to deliver it;*
> > >
> > > (b)  *the communication is deemed to have been received on the day it is so delivered.*
> > >
> > > (2)   ... *The provisions of this article do not apply to communications in court proceedings.* '
> >
> > *[(2)]    Without affecting subsection (1), if a written communication (other than communications in court proceedings) is sent by any means by which information can be recorded and transmitted to the addressee, the communication is deemed to have been received on the day it is so sent.*
> >
> > *[(3)]    Subsection (2) applies only if there is a record of receipt of the communication by the addressee.*" (emphasis added)

3.5      In the present case, the parties did agree otherwise.  Clause 14 of the Purchase Agreement provides:

> " *This Agreement shall be governed by the laws of Hong Kong SAR.  Any controversy, dispute or claim arising out of or in relation to the interpretation or otherwise of any of the clauses of this Agreement shall be finally settled in accordance with the rules of Hong Kong International Arbitration Center.  The proceedings shall take place in*

*Hong Kong SAR and shall be held in English language."* (emphasis added)

3.6      The Plaintiff accepts that the Arbitral Proceedings were, pursuant to clause 14 of the Purchase Agreement, governed by the 2018 Rules[8]. Article 3 of the 2018 Rules, *inter alia*, provides as follows:

> "*[3.1]    Any written communication pursuant to these Rules shall be deemed to be received by a party, arbitrator, emergency arbitrator or HKIAC if:*
>
> (a) *communicated to the address, facsimile number and/or email address communicated by the addressee or its representative in the arbitration; or*
>
> (b) *in the absence of (a), communicated to the address, facsimile number and/or email address specified in any applicable agreement between the parties; or*
>
> (c) *in the absence of (a) and (b), communicated to any address, facsimile number and/or email address which the addressee holds out to the world at the time of such communication; or*
>
> (d) *in the absence of (a), (b) and (c), communicated to any last known address, facsimile number and/or email address of the addressee; or*
>
> (e) *uploaded to any secured online repository that the parties have agreed to use.*
>
> *[3.2]    If, after reasonable efforts, communication cannot be effected in accordance with Article 3.1, a written communication is deemed to have been received if it is sent to the addressee's last-known address, facsimile number and/or email address by means that provides a record of attempted communication.*
>
> *[3.3]    Any written communication shall be deemed received on the earliest day when it is communicated pursuant to paragraph 3.1(a) to (d), uploaded pursuant to paragraph 3.1(e), or attempted to be communicated pursuant to Article 3.2. For this purpose, the date shall be determined according to the local time at the place of receiving such written communication or a notice of the upload pursuant to paragraph 3.1(e)..."* (emphasis added)

---

[8] Plaintiff's Skeleton Submissions §88.

3.7      Under Article 4.1 of the 2018 Rules, the party initiating arbitration shall communicate the NOA to HKIAC and the other party. Therefore, the NOA is a written communication covered by Article 3.1.

3.8      At the time of the issuance of the NOA, the Plaintiff's contact details were variously stated in a number of different sources.

3.9      The Plaintiff's address printed on Ye and Qin's business cards is stated to be "*North Side of Hangzhou Bay Road, Haiyan Economic Development Zone, Zhejiang, China*" ("**Business Card Address**"). Their business cards also provide a fax number ("**Business Card Fax Number**") and the email addresses of Ye and Qin, respectively dgye@chinapanocean.com and ylqin@chinapanocean.com ("**Qin Email Address**").

3.10      The Plaintiff's address in the Purchase Agreement is stated to be "*Economic Development Zone of Hangzhou Bay Avenue, on the North side of Haiyan County, Zhejiang Province, China*" ("**PA Address**"). Clause 16 of the Purchase Agreement provides:

> "*All notices required to be given by either party shall be in writing and shall be airmailed, telexed or cabled to the address first stated above, <u>except as may otherwise be provided in any Purchase Order,</u> or at such other address as such party may hereafter from time to time designate in writing and <u>shall be deemed received, in the case of airmail, five days after it is postmarked, and in the case of telex, upon transmission (with answer back confirmed) to the other party's telex facilities.</u>*" (emphasis added)

3.11      The Plaintiff's address in the POs is stated to be "*Economic Development Zone of Hangzhou Bay Avenue, North Side of Hangzhou Bay Road, Haiyan 314305, Zhejiang Prov, China*" ("**PO Address**").

3.12      Pausing here, it may be noted that the Business Card Address, the PA Address and the PO Address all appear, by Hong Kong standards, to be

- 12 -

somewhat vague. Of the three, the PO Address contains the most details, it including what appears to be a postal code. I do not regard it unusual that the various formulations of the address do not contain for example a unit number or a street number, bearing in mind that the Plaintiff's business involves the manufacturing of cargo containers, no doubt comprising of sizeable facilities for both production and storage of finished products. Indeed, a "vague" address is used in the Plaintiff's business cards.

3.13 The Plaintiff's address in its business certificate is stated to be "海盐经济开发区泾海路 527 号 108 室"("**Registered Address**"). It is Ye's evidence (which is disputed by the Defendant) that the Plaintiff had provided its business certificate to the Defendant in 2019. Ye further points out that the Registered Address is available to the public based on a PRC company search and it is the address used by the Defendant in the Mainland Enforcement Proceedings. It is suggested by Ye that the Defendant ought to have used the Registered Address for the purpose of sending the arbitral documents to the Plaintiff.

3.14 Under Article 4.3(b) of the 2018 Rules, the NOA should include the names and (in so far as known) the addresses, facsimile numbers and/or email addresses of the parties and of their representatives. In the NOA, the Defendant stated the Plaintiff's contact details to be (1) the PO Address, (2) the Business Card Fax Number and (3) the Qin Email Address. Qin was also stated to be the Plaintiff's contact representative (collectively **"P's Contact Details"**).

3.15 For the reasons set out below, written communications communicated to the Plaintiff at P's Contact Details stated in the NOA did trigger the deeming provisions under Article 3.1 of the 2018 Rules. In my view, written

- 13 -

communications so communicated plainly do not fall within the type of *"fictional notice"* described at *Sun Tian Gang* §58:

> " *I also agree with Ms Wong that even if any of the Deeming Provisions can operate to "deem" service of the NOA on Sun, he was not given "proper notice" of the arbitral proceedings. The ground to set aside under Article 34 (2) (a) (ii) is not lack of "notice", but lack of "proper notice", which describes the necessary quality of the service. <u>Fictional notice deemed by purported delivery to an address at which the recipient could not be found and, in this case, was known by Gas and JSM not to have been found, cannot be "proper notice".</u>* " (emphasis added)

3.16    As regards the PO Address provided as part of P's Contact Details:

(1)    Whilst it is not the PA Address, it is still capable of falling within Article 3.1(b) as being *"the address specified in any applicable agreement between the parties"*.  This is because, as noted above, Clause 16 of the Purchase Agreement specifically provides that the PA Address being the default address to which notice is required to be given is subject to the *proviso* *"except as may otherwise be provided in any Purchase Order"*; and

(2)    Even were (1) above not so, the PO Address is, on the evidence, the last known address under Article 3.1(d).  All of the POs (affixed with the Plaintiff's chop) were placed in February or March 2021 shortly before the commencement of the Arbitral Proceedings.

3.17    As regards the Business Card Fax Number provided as part of P's Contact Details, it is within either Article 3.1(c) (as being the fax number which Plaintiff held out to the world) or Article 3.1(d) (as being the last known fax number).

3.18    As regards the Qin Email Address provided as part of P's Contact Details, it is within Article 3.1(d) (as being the last known email address).  On

- 14 -

the evidence, the pre-action correspondence issued by the Defendant's former solicitors ("**Ince**") commencing on 21 June 2021 were only sent to the Plaintiff via the Qin Email Address. Indeed, the contemporaneous records show that emails relating to the Purchase Agreement and the POs were exchanged predominantly between the Defendant and Qin at the Qin Email Address (without copying Ye). The only email correspondence between Ye and the Defendant adduced by the Plaintiff was "social" in nature and did not relate to the Purchase Agreement and the POs.

3.19     It bears emphasis that the means of communication set out at Article 3.1 of the 2018 Rules are couched disjunctively. In other words, their deeming effect is triggered (1) when *any* of Articles 3.1(a) to (e) is complied with and (2) when a written communication is communicated by *any* of the means set out within each of Article 3.1 (a) to (d) (ie physical delivery, fax or email).

3.20     The Defendant has prepared a table ("**Table**")[9] summarizing the means by which written communications were communicated to the Plaintiff by the Defendant, HKIAC and the Tribunal. It is plain from the Table that the Defendant, HKIAC and the Tribunal had throughout the Arbitral Proceedings ensured that the written communications were communicated in compliance with Article 3 of the 2018 Rules. Subject to a few exceptions (as to which see further below), the written communications were communicated to the Plaintiff via multiple means permitted under Article 3.

3.21     The foregoing may be illustrated by the specific examples relied on by Mr Chong (§3.3(4) above):

---

[9]  Appendix 1 to Mr Juergen Matthias Moll's Affidavit. A copy providing cross-references to the hearing bundles was provided after the hearing upon the courts' request at the hearing.

- 15 -

(1)    As regards the NOA, Ince sent the notice to the Plaintiff via email
(to the Qin Email Address), fax (to the Business Card Fax Number),
airmail (to the PO Address) and courier (via DHL to the PO Address).
A successful fax transmission report and a report from DHL showing
that the package was successfully delivered (and signed for) are
adduced into evidence.   There is no evidence that the airmail was
unsuccessful[10].  It is pertinent to note that, at the request of HKIAC,
on 3 August 2021, the Defendant furnished proof of service of the
NOA on the Plaintiff to the HKIAC;

(2)    As regards the appointment of the Tribunal, HKIAC sent letters
dated 2, 7 17, 24 September and 18 October 2021 by email, fax and
courier to the Plaintiff's Contact Details, the last-mentioned letter
being the one setting out HKIAC's appointment of the Tribunal.
According to the Plaintiff, one of the identified letters (ie the one
dated 17 September 2021) could not be couriered by SF Express due
to "Incomplete receiver's address".  Apart from that isolated incident,
no documentary evidence has been adduced by the Plaintiff to show
that  HKIAC's  letters  mentioned  above  were  otherwise  not
successfully communicated by email, fax[11] and courier;

(3)    As regards the Award, it was sent by HKIAC to the Plaintiff by email,
fax and courier (by Express Mail Service ("EMS")).  The evidence
shows that the Award was not communicated successfully by fax or
courier.   In relation to fax, the Plaintiff, had disconnected the
Business Card Fax Number in June 2022.  As regards courier, EMS

---

[10]  In so far as necessary, the NOA sent via airmail would have complied with Clause 16 of the Purchase
     Agreement.
[11]  The China Mobile report does not cover the period between September and October 2021 (see further below).

has confirmed that the Award (and 5 other packages sent by HKIAC) were not signed for and therefore not delivered. The 6 undelivered packages were sent by HKIAC in April to June 2022. It is important to note that the explanation given by EMS is that the packages were not signed for, not that the address was erroneous or incomplete. I do not find that surprising as physical delivery and receipt by courier were in all likelihood affected by the COVID-19 pandemic. Contemporaneously, in May 2022, the Tribunal stated that some of her written communications would be communicated by email only. For example, in the Tribunal's email dated 6 May 2022, the Tribunal stated:

> " ... the courier service to the PRC is still subject to various restrictions and there are still substantial delay due to the latest covid situation. I am therefore only sending my enquires and directions above by way of email."

3.22    Having examined the Table, I am satisfied that all the written communications set out therein were communicated in compliance with Article 3 of the 2018 Rules, and as a result, they are deemed received by the Plaintiff.

3.23    The foregoing being the case, the further question is therefore whether there is sufficient and credible evidence to rebut the presumption of receipt. As stated at *Sun Tian Gang* §37:

> "*Even accepting that the Model Law is aimed to achieve effective arbitration without delay, and that the objective of the Rules is to provide for finality and certainty in the process of arbitration, I cannot agree that the Model Law can or was ever intended to derogate from principles of natural justice and fairness... I therefore do not agree that the Deeming Provisions set out in Article 3 (1) and Article 2 of the Rules can preclude a party from adducing evidence to show that, notwithstanding the delivery of any written communication to his last known place of business, habitual residence or mailing address, he had not in actual fact received such written communication. As highlighted in paragraphs 4 and 5 of this Decision, the initiation of the arbitration*

> *is an important step in the process, and it would offend fundamental rules of natural justice if a party is shut out entirely from presenting the evidence which can establish that he was never given actual notice of the arbitration, because he had never received the notice of commencement of the arbitration left at an address - which can be for a myriad of legitimate and conceivable reasons. It will be for the Tribunal and the court to consider and decide on the facts of each case whether there is sufficient and credible evidence to rebut the presumptions of receipt."* (emphasis added)

3.24    I should point out that the Tribunal was keenly aware of the fact that she needed to take extra care in maintaining the structural integrity of the Arbitral Proceedings in the light of the complete lack of response on the Plaintiff's part. The Tribunal only came to her conclusion that due notices of the relevant written communications were given to the Plaintiff after a careful analysis: Award Section F.

*(ii)*    *Whether deeming provision rebutted by the Plaintiff on the evidence*

3.25    In my view, the Plaintiff has failed to adduce sufficient and credible evidence to rebut the presumption of receipt. It is important to bear in mind that the overarching theme in the Plaintiff's evidence is that Ye himself or "the management" did not receive *any* of written communications each sent to the Plaintiff via multiple means (courier, fax and email).

*Physical delivery of written communication*

3.26    The Plaintiff first seeks to demonstrate that the PO Address is an ineffective address and the proper address should be the Registered Address. I am unable to accept the Plaintiff's argument for the following reasons:

    (1)    In so far as it is suggested that the Registered Address is specific in that it includes a room number and a street number, no explanation has been proffered by the Plaintiff as to why the Business Card Address is as vague as, if not even more vague than, the PO Address;

(2)    Prior to the commencement of the Arbitration, a number of letters were couriered by Ince in June 2021 to the PO Address and signed for by Qin and one Wang Jian Yan ("**Wang**"). It is common ground that Qin was at the material time an employee of the Plaintiff and the Plaintiff has not disputed the Defendant's evidence that Wang was also an employee of the Plaintiff; and

(3)    Following the commencement of the Arbitration, on a number of occasions, Ince couriered written communications to the Plaintiff by DHL and they were delivered and signed for by one Fang Zhou ("**Fang**"). There is no evidence to suggest that Fang was not an employee of the Plaintiff.

3.27    The Plaintiff then argues that some of the written communications sent to the PO Address were not successfully delivered:

(1)    The Plaintiff relies on HKIAC's failure on 6 occasions to courier written communication by EMS. I have already dealt with this at §3.21(3) above. Moreover, as pointed out by Mr Brown, HKIAC sent 17 letters by courier to the PO Address, meaning the other 11 deliveries from the HKIAC were delivered at the PO Address; and

(2)    2 letters sent by Ince to the Plaintiff via airmail were returned (but they were successfully delivered by courier, email and/or fax in any event). However, they were amongst the 18 letters sent by Ince to the Plaintiff via airmail which means that the other 16 letters were successfully delivered by airmail.

3.28    On the evidence, the majority of the written communications were successfully delivered to the Plaintiff at the PO Address. In my view, the PO

Address is not an ineffective address as contended by the Plaintiff. Even if written communications were on sporadic occasions not delivered at the PO Address, it does not follow from the foregoing that the PO Address is ineffective, especially when some of those occasions were caused by factors unrelated to the "effectiveness" of the address, for example COVID-19 considerations as identified by the Tribunal.

3.29    I also do not regard the Plaintiff's case that the Registered Address is the "correct address" is a sound one. Were that to be the case, it is unclear why the Registered Address does not appear in the business cards, the PA or the PO.

3.30    I further do not see anything sinister (if so suggested by the Plaintiff) in the Defendant using the Registered Address in the Mainland Enforcement Proceedings. This may or may not be explained by the fact that there are different rules on service of documents in Mainland court proceedings. In any event, the Plaintiff's evidence is not that it received notice of the freezing order granted in the Mainland Enforcement Proceedings at the Registered Address. Instead, the Plaintiff's own evidence is that it only learnt about the freezing order from its bank.

*Delivery of written communications by fax*

3.31    The first point taken by Mr Chong is that fax transmission is not an agreed mode of communication in the Purchase Agreement. However, one is here concerned with written communications communicated in the Arbitral Proceedings, which is plainly governed by the 2018 Rules and not the Purchase Agreement.

3.32    The Plaintiff next relies on a report from China Mobile. The China Mobile report only covers the period from December 2021 to May 2022

("**Period**").  It is the Plaintiff's case that it disconnected the Business Card Fax Number in June 2022.  The China Mobile report shows that, during the Period, only fax transmissions from Mainland numbers were received at the Business Card Fax Number.

3.33    The difficulty with the Plaintiff's reliance on the China Mobile report is that it is unclear whether the China Mobile report was compiled on the basis that it would include fax transmissions from overseas.  The request made by the Plaintiff to China Mobile has not been adduced into evidence, and the China Mobile report does not expressly state that it was prepared on the basis that it would include both overseas and local fax transmissions.

3.34    The fax transmissions sent by the Defendant are accompanied by a confirmation of successful transmission (except those transmitted in June 2022 after the Business Card Fax Number was disconnected).  These are contemporaneous records to which I attach significant weight.  There is no suggestion by the Plaintiff that the contemporaneous fax confirmations are not authentic or unreliable.

3.35    I accept that where it is stated in the Table that a written communication was communicated by fax, that was done successfully (except for the period after the Business Card Fax Number was disconnected).  Only confirmations for the Defendant's fax transmissions to the Plaintiff are adduced into evidence.  The burden being on the Plaintiff, there is no evidence adduced (apart from the China Mobile report to which I do not attach significant weight) to suggest that any fax transmission by HKIAC or the Tribunal to the Plaintiff was not successful.

*Delivery of written communications by email*

3.36     Like fax transmissions, Mr Chong takes the point that email is not an agreed mode of communication in the Purchase Agreement. I have already dealt with this point at §3.31 above.

3.37     The contemporaneous evidence plainly shows that Qin was the Defendant's main contact within the Plaintiff's organization. Qin was involved in the negotiation of the Purchase Agreement, and the email correspondence was mainly conducted between Qin and the Defendant (without copying Ye). It is not difficult to see the reason for it, as on Ye's own evidence, he does not understand English. It is also easy to understand why the written communications were sent to the Qin Email Address, as the Arbitral Proceedings were agreed to be conducted in English.

3.38     I do not accept Ye's evidence that Qin was a low-ranking employee, or that Qin had resigned or was terminated in September 2021, his departure preceded by vacation leave in July 2021.

3.39     First, no documentary evidence has been adduced by the Plaintiff in relation to Qin's departure (eg termination or resignation letter).

3.40     Secondly, the contemporaneous documents conversely show that even in December 2021 (around the time of filing of the Points of Claim by the Defendant in the Arbitral Proceedings on 20 December 2021), Qin sent an email to the Defendant from the Qin Email Address on 16 December 2021 in the following terms:

> "*Dear Juergen,*
>
> *We are writing this email to show our great apology for the trouble we bought for the previous orders.*
>
> *To be honest, your lawyer's leter [sic] after letter keep worrying us as well.*

*We both know things have to be solved.*

*So we don't want both of us keep being in a stalemate like that and we don't hope the relationship was broken forever for this issue.*

*What we hope is both of us can find a good solution together and continue the cooperation.*

*Above is our sincere wish. Hope to get your good and kind reply.*

*Thanks."* (emphasis added)

3.41    It is plain that emails sent by Ince were received by Qin at the Qin Email Address. When there was no reply from the Defendant, Qin sent chaser emails from the Qin Email Address to the Defendant on 21 and 22 December 2021.

3.42    Thirdly, according to Ye's own evidence, when he found out about the Award, his immediate reaction was to contact Qin to find out what happened. On 2 November 2022 (more than a year after his purported departure from the Plaintiff in September 2021), Qin emailed the Defendant from the Qin Email Address in the following terms:

*"Dear Juergen,*

*How are you?*

*We both know we have some unhappy order issue between both of us.*

*We hope both of us can find a good solution together and continue the cooperation. Above is our sincere wish. Hope to get your good and kind reply."*

3.43    Fourthly, on the Plaintiff's own evidence, at around the same time on 15 November 2022, a notice of arbitration (in respect of another arbitration commenced by a party unrelated to the Defendant against the Plaintiff) was emailed to Qin at the Qin Email Address by a firm of solicitors in England. No explanation has been proffered by the Plaintiff as to why a foreign firm of solicitors would email a notice of arbitration to Qin, an alleged low-ranking

employee, at the Qin Email Address more than one year after Qin's purported departure from the Plaintiff.

3.44      Fifthly, Ye's evidence is that only Qin had access to the Qin Email Address and no one else within the Plaintiff organization had access to it after Qin's departure.  As stated above, I do not accept Ye's bare allegation that Qin had resigned or was terminated in September 2021.  Even if that were so, it is plain that the Qin Email Address was used regularly to correspond with customers and outside parties.  It makes no commercial sense to suggest that the Plaintiff, being a sizeable organization, would simply neglect or omit to make alternative arrangements to maintain communication flow with outside parties following Qin's departure.

3.45      Sixthly, Qin clearly had access to the Qin Email Address in December 2021 after his alleged departure.  The suggestion that Qin would on a frolic of his own sent the pacifying emails in December 2021 to the Defendant and then proceed to withhold notifying the Plaintiff of the Arbitral Proceedings does not make any or any commercial sense.  In a similar vein, when the Plaintiff approached Qin in November 2022 after the freezing of its bank account, there is no documentary evidence to show that the Plaintiff made any complaints to Qin for having withheld the Arbitral Proceedings from the Plaintiff.

3.46      In my view, on the evidence before me, Qin was at least one of the persons designated within the Plaintiff organization to deal with the Arbitral Proceedings.  In so far as necessary, I further agree with Mr Brown that the Plaintiff's argument on Qin's authority to receive written communication is misplaced.  Mr Chong seeks to draw an analogy with the observations set out at *Sun Tian Gang* §45:

> "*Mr Chan SC relies on this Court's decision in Dana Shipping and Trading SA v Sino Channel Asia Ltd (unrep., HCCT 47/2015, [2016] HKEC 599) (14 March 2016), to support his argument that service of the NOA on Du, as Sun's authorised agent, is good service on Sun. Dana Shipping was a decision on an application for security, and this Court was only conducting a preliminary review of the merits of the respondent's intended application to the English supervisory court to set aside an arbitral award. The question of an agent's authority to accept service of arbitral proceedings was not fully argued before this Court. Since the decision of this Court in Dana Shipping, the English court in fact set aside the award on the ground that the agent had neither actual, nor implied or apparent authority to accept service of the notice of arbitration, referring to Lantic Sugar Ltd v Baffin Investments Ltd (The Lake Michigan) [2010] 2 Lloyd's Rep 141. In The Lake Michigan, the English court held that the P&I Club agent did not have actual authority to accept service of a notice of arbitration, despite its wide authority generally to act on behalf of its members/principals, including conducting settlement negotiations and granting extensions of time to commence arbitration, etc. In Sino Channel Asia Ltd v Dana Shipping And Trading Pte Singapore [2016] EWHC 1118 (Comm), the English court accepted the analogy of the wide authority of solicitors to deal with a case on behalf of a client, but (without more) that does not translate into authority to accept service of proceedings on behalf of the client. Emphasis was placed on the significance of a notice to commence arbitration, being an important step which has significant legal consequence beyond the performance of ordinary contractual obligations.*"

3.47    As pointed out by Mr Brown, Qin was not a third party in a position akin to a solicitor or a P&I Club agent but an employee of the Plaintiff. At the time of the issuance of the NOA (July 2021), Qin was indisputably an employee of the Plaintiff.

3.48    Further and in any event, the facts of the present case bear no resemblance to those in *Sun Tian Gang* which was concerned with service on a natural person who was at the material time incarcerated. Where, as here, one is dealing with service to a corporate entity under the 2018 Rules, it is a matter of internal management whether the arbitral documents reached the "correct" personnel within the Plaintiff organization (which I have found Qin to be in any event). As held at *U v S* [2018] HKCFI 2086 §16:

> "*As for the Respondent's arguments on the lack of notice Ground, the relevant documents including the notice of arbitration had been delivered to the business address of the Respondent, and the Applicant pointed out that this was in accordance with the CIETAC Rules which governed the 2ⁿᵈ Arbitration, as the parties had agreed under the arbitration agreement. The fact that it was redirected internally by the Respondent to the Parent, and was left unopened, was a matter of the Respondent's internal management.   The respondent in the 2ⁿᵈ Arbitration is the corporate Respondent, and not the individual A named as its legal representative.  The facts of the present case are entirely distinguishable from the facts of Sun Tian Gang v HK & China Gas (Jilin) Ltd [2016] 5 HKLRD 221.*"*

*Conclusion on the Proper Notice Ground*

3.49      In my view, the Proper Notice Ground is entirely opportunistic.  I have no hesitation in rejecting it.  I find that the Plaintiff has failed to prove that it was not given proper notice of the appointment of an arbitrator or of the arbitral proceedings or was otherwise unable to present his case.  For completeness, I do not place any weight on the forensic submission that the Plaintiff is a sizeable organization and there was no reason for its lack of participation in the Arbitral Proceedings had proper notice been given.  Nothing has been produced by Ye to suggest that the Plaintiff had engaged the Defendant prior to the commencement of the Arbitral Proceedings to dispute its liability.

3.50      As pointed out at *KB v S & Ors*, HCCT 13 of 2015, 15 September 2015 §1(6), in dealing with applications to set aside an arbitral award, or to refuse enforcement of an award, whether on the ground of not having been given notice of the arbitral proceedings, inability to present one's case, or that the composition of the tribunal or the arbitral procedure was not in accordance with the parties' agreement, the court is concerned with the structural integrity of the arbitration proceedings.  In this regard, the conduct complained of "*must be serious, even egregious*", before the court would find that there was an error sufficiently serious so as to have undermined due process.

3.51      The Plaintiff is unable to show that any of the written communication was not communicated successfully by at least one of the means permitted under Article 3.1 of the 2018 Rules.  Any sporadic failure in respect of one of the means of communication does not materially affect the structural integrity of the Arbitral Proceedings and cannot be considered serious or egregious.

## 4.    *Public Policy Ground*

4.1      In this section, I will deal with a number of alleged procedural irregularities which are advanced exclusively under the rubric of the Public Policy Ground.  There are other alleged irregularities which cut across the Public Policy Ground and other grounds.  Those are dealt with in the subsequent section.

4.2      The applicable principles are established.  *"Contrary to public policy"* has been held by the Court of Final Appeal to mean *"contrary to the fundamental conceptions of morality and justice"* of the forum (*Hebei Import & Export Corp v Polytek Engineering Co Ltd* (1999) 2 HKCFAR 111 at 139F-G).  In *A v R (Arbitration: Enforcement)* [2009] 3 HKLRD 389, the court explained (at para 23) that if the public policy ground is to be raised, there must be *"a substantial injustice arising out of an award which is so shocking to the court's conscience as to render enforcement repugnant"*.

## (i)    *Failure to notify HKIAC that the Expedited Procedure no longer appropriate*

4.3      The Plaintiff says that the Defendant, in discharging its duty of good faith, was required to inform HKIAC when the surrounding circumstances of the Arbitral Proceedings rendered the Expedite Procedure no longer appropriate.

4.4      The alleged irregularity arose in the following way.

4.5        Under Article 42.1(a) of the 2018 Rules, prior to the constitution of the arbitral tribunal, a party may apply to HKIAC for the arbitration to be conducted in accordance with Article 42.2 where the amount in dispute representing the aggregate of any claim and counterclaim (or any set-off defence or cross-claim) does not exceed the amount set by HKIAC, as stated on HKIAC's website on the date the Notice of Arbitration is submitted.

4.6        Article 42.2 provides as follows:

> " *When HKIAC, after considering the views of the parties, grants an application made pursuant to Article 42.1, the arbitral proceedings shall be conducted in accordance with an Expedited Procedure based upon the foregoing provisions of these Rules, subject to the following changes:*
>
> (a)    *the case shall be referred to a sole arbitrator unless the arbitration agreement provides for three arbitrators;*
>
> (b)    *if the arbitration agreement provides for three arbitrators, HKIAC shall invite the parties to agree to refer the case to a sole arbitrator. If the parties do not agree, the case shall be referred to three arbitrators;*
>
> (c)    *HKIAC may shorten the time limits provided for in the Rules, as well as any time limits that it has set;*
>
> (d)    *after the submission of the Answer to the Notice of Arbitration, the parties shall in principle be entitled to submit one Statement of Claim and one Statement of Defence (and Counterclaim) and, where applicable, one Statement of Defence in reply to the Counterclaim;*
>
> (e)    *the arbitral tribunal shall decide the dispute on the basis of documentary evidence only, unless it decides that it is appropriate to hold one or more hearings;*
>
> (f)    *subject to any lien, the award shall be communicated to the parties within six months from the date when HKIAC transmitted the case file to the arbitral tribunal. In exceptional circumstances, HKIAC may extend this time limit;*
>
> (g)    *the arbitral tribunal may state the reasons upon which the award is based in summary form, unless the parties have agreed that no reasons are to be given.*"

4.7        Article 42.3 provides:

> "Upon the request of any party and after consulting with the parties and
> any confirmed or appointed arbitrators, HKIAC may, having regard to
> any new circumstances that have arisen, decide that the Expedited
> Procedure under Article 42 shall no longer apply to the case. Unless
> HKIAC considers that it is appropriate to revoke the confirmation or
> appointment of any arbitrator, the arbitral tribunal shall remain in
> place."

4.8        At NOA §(k), the Defendant sought a direction for the proceedings
to be conducted under the Expedited Procedure:

> "The Claimant seeks a direction pursuant to Article 42 that the
> arbitration be conducted in accordance with the Expedited Procedure
> set out in Article 42.2. The amount in dispute referred to above is
> equivalent to approximately HKD 8,340,000 and is accordingly well
> below the monetary threshold of HKD 25m set by the HKIAC. It follows
> that the matter falls under Article 42.1(a)."

4.9        In the NOA, the disputes referred to arbitration were as follows:

> "Pursuant to the [Purchase Agreement], the Respondent was to
> manufacture and sell to the Claimant shipping containers of various
> types and sizes, in numbers and in accordance with a schedule to be
> determined under the terms of the [Purchase Agreement]. The
> Respondent has failed to manufacture a substantial number of units on
> time (or at all). <u>The Claimant claims liquidated damages as provided
> for under the [Purchase Agreement], as well as damages at large for
> delayed delivery or, should the subject units never be delivered, for non-
> delivery.</u>
>
> The Claimant has already invoiced the Respondent in respect of
> liquidated damages in the sum of USD 1,069,260. Liquidated damages
> continue to accrue and will continue to be invoiced regularly as they
> accrue. The Claimant may have further damages claims as referred to
> above, but those have yet to be quantified." (emphasis added)

4.10       In the NOA, the relief or remedy sought was stated to be:

> "The Claimant seeks an award of liquidated damages already invoiced
> in the sum of USD 1,069,260, together with further liquidated damages
> as may accrue prior to delivery of the subject units. Depending on
> if/when the units are ultimately delivered, the Claimant may seek further

> *damages for delayed delivery or non-delivery. The Claimant further
> seeks interest and costs."* (emphasis added)

4.11      In the Statement of Claim communicated on 20 December 2021,
consistent with the NOA, the Defendant expressly reserved its rights to claim
over and above the LD Claim (20'). At Statement of Claim §19, it is stated:

> *"For the avoidance of doubt, at this stage the Claimant seeks an <u>interim
> final award</u> of the liquidated damages which have accrued and been
> invoiced to the Respondent as aforesaid, together with interest thereon
> and costs, as well as a <u>declaration that the Respondent remains obliged
> to manufacture and make ready for delivery the Undelivered Units
> [("Declaratory Relief")]</u>. The Claimant's hope and expectation is that
> the Respondent will ultimately perform those obligations. That being
> the case, the Claimant asks that the Tribunal <u>reserve its jurisdiction</u> as
> to other matters, including but not limited to:*
>
> (a)   *Any claim for <u>further liquidated damages which may accrue in
>       future</u>; and/or*
>
> (b)   *Any claim for <u>damages for delayed delivery of the 40' units</u>, in
>       respect of which no Liquidated Damages rate is set by Clause 5(a)
>       or otherwise by the Purchase Agreement; and*
>
> (c)   *Any claim for <u>damages for non-delivery</u>, in the event that the
>       Respondent ultimately never manufactures and makes ready for
>       delivery the Undelivered Units."* (emphasis added)

4.12      The Plaintiff argues that the Defendant should have on at least 2
occasions informed HKIAC that the Expedited Procedure was no longer
appropriate. First, the Defendant's LD Claim (20') as at the date of the Statement
of Claim had increased to US$4,080,240 and therefore exceeded the HK$25
million monetary threshold set by HKIAC. Secondly, when the Defendant
decided to pursue claims in addition to the LD Claim (20'), its claims for damages
had increased to over US$18 million. It is said by the Plaintiff that the increased
*quantum* would have justified the scrutiny of a more robust procedure than that
under the Expedite Procedure (for example a live hearing and a panel of 3
arbitrators).

4.13      As regards the first occasion, the LD Claim (20') would by effluxion of time naturally increase.   The increase in *quantum* does not affect the complexity of the underlying claim.   As regards the second occasion, the Defendant's pursuit of the additional claims was in response to an invitation by the Tribunal to it to set out its final relief in the event she was not minded to grant the Declaratory Relief[12].  As stated in the Award:

> " [60]    By further written submissions dated 6 April 2022, the Claimant clarifies that if the Arbitral Tribunal is to take the view that it should not grant the declaratory relief sought, nor, therefore, reserve its jurisdiction as to various other matter referred to in Paragraph 59 above, the relief sought as set out in the Notice and the Statement of Claim is as follows...
>
> [91]    In the circumstances where the Claimant put forward evidence which shows that the Respondent is not willing nor in the position to make ready for delivery of the Undelivered Units, the Claimant no longer has any legitimate interest to keep the Agreement alive in the hope of future performance.  The Arbitral Tribunal is not satisfied that a declaration sought by the Claimant should be made."

4.14      It seems to me what is in fact suggested by the Plaintiff is that the Defendant is obliged to make a request under Article 42.3 to disapply the Expedited Procedure.  No authority is cited for the proposition, namely where, as here, the Plaintiff had chosen not to participate in the Arbitral Proceedings, the Defendant was nevertheless obliged to make a request for a more elaborate procedure which the Plaintiff would unlikely participate in in any event.

4.15      Further, as pointed out at §1.14 above, even within the "streamlined" Expedited Procedure, the Tribunal was meticulous and careful in the process, even disallowing substantial parts of the Defendant's claim without any input by

---

[12]   In the Tribunal's letter dated 8 March 2022, she regarded the Declaratory Relief was in substance a claim for specific performance.

the Plaintiff.  The Plaintiff's submissions fail to acknowledge this crucial aspect and barely asserts the need of closer scrutiny.

4.16      In my view, this complaint does not come close to having the character of precipitating a substantial injustice which is shocking to the court's conscience.

*(ii)      Failure to notify the Tribunal that the Plaintiff did not have proper notice*

4.17      I have already dealt with the issue of proper notice at section 3 above.

4.18      There is one additional aspect.   The Plaintiff argues that under Procedure Order No 1, the Tribunal had directed that written communication must be communicated to the Plaintiff by courier, fax *and* email.  It is alleged that during the Arbitral Proceedings, the Defendant was in breach of its obligations, as some of the written communications were not communicated via all 3 means.

4.19      I do not agree.  Procedural Order No 1 §5(2) provides:

> "*Notifications and communications shall be deemed to have been validly made when they have been sent:*
>
> *(2)    If to the Respondent, using the following details (as appropriate):-*
>
> *Pan Ocean Container Supplies Co., Ltd*
> *Economic Development Zone of Hangzhou Bay Avenue, North Side of Hangzhou Bay Road, Haiyan 314305, Zhejiang Province, People's Republic of China*
> *By fax: +86 573 8905 2333*
> *By email: ylqin@chinapanocean.com & by courier*"
> (emphasis added)

4.20      When the underlined words "*as appropriate*" is read together with Procedural Order No 1 §6 and the 2018 Rules, it seems to me abundantly clear that the obligation is to communicate by any one of the means stated.  Procedural Order No 1 §6 provides:

- 32 -

> "*A party shall notify the opposing party, the Sole Arbitrator and HKIAC immediately and in writing of any changes to its name, description, address(es), email address(es) or facsimile number(s).* <u>*In the absence of such notifications, communications and notifications to the addresses, email addresses or facsimile numbers stated above shall be deemed validly made.*</u>" (emphasis added)

4.21    Indeed, as pointed out above, the Tribunal's own interpretation of Procedural Order No 1 was that, during a period of the COVID-19 pandemic, it was permissible for her to only send communications to the Plaintiff and the Defendant via only email.

4.22    I likewise do not see how this complaint can remotely shock the court's conscience.

*(iii)    Exhibiting "without prejudice" communications as evidence*

4.23    Statement of Claim §§17-18 plead as follows:

> "*[17]    The Claimant would, in particular, highlight that on 2 July 2021 [C/113], the Respondent indicated its agreement to a proposal set out in a letter dated 25 June 2021 from the Claimant's solicitors [C/111-112]. (For the avoidance of doubt, certain messages from the Claimant to the Respondent which were marked "Without Prejudice" have been included here, so the Tribunal can see what it was the Respondent was agreeing to by its message of 2 July 2021.   This is not intended to constitute a wider waiver of without prejudice privilege.) It was stated in the 25 June 2021 letter that:*
>
> > '*... in the event that the proposed production schedule set out is fit/filled, our clients will consider forgoing their claims for liquidated damages and indeed damages more generally.   In the meantime, liquidated damages will continue to accrue on all of the outstanding units as per the Purchase Agreement.*'
>
> *[18]    It follows that the Claimant did not agree to forego or waive its claims for Liquidated Damages, but only to consider doing so, in the event the production schedule proposed in the 25 June 2021 letter was fulfilled.  Regrettably, within just ten days of its message of 2 July 2021, agreeing to the Claimant's proposal, the Respondent reneged on what had been agreed [C/119].  No further or subsequent agreement has been reached between the Claimant and the Respondent.*"

4.24     The Plaintiff argues that it is shocking that the Defendant had violated without prejudice privilege.

4.25     Ince's letter dated 25 June 2021 has been adduced into evidence[13]. It is not marked without privilege and it is plain that the letter simply urges the Plaintiff to commit to a revised production schedule (beyond the completion dates stipulated in the POs):

> "*Be that as it may, the Buyer wishes to find a solution to the present situation. That being the case, we urge you to commit to production as follows, in accordance with your obligations under the Purchase Agreement:*
>
> (a)  *Build 3000 units of 20' dry van Containers by the end of August i.e. 31 August 2021, of which 1000 units should be built by the end of July i.e. by 31 July 2021.  Our clients would expect to see a firm production plan for those 1000 units within 3 working days of the date of this letter, so as to give them confidence that those units will be produced by the end of July.*
>
> (b)  *Build the remaining 2109 units of 20' and 40' Containers by the end of October i.e. by 31 October 2021, subject to a minimum of a combined total of 190 40' Containers and 40' HC Containers to be built by the end of August i.e. by 31 August 2021.*
>
> (c)  *The Buyer reserves the ultimate right to vary, order and select, as and when appropriate, which P.O. is to be built, once there is agreement on the production slots.*
>
> *We look forward to receiving confirmation that you agree to the proposed production schedule set out above.*
>
> *Without prejudice to our clients' rights and claims, as set out in our previous letter, in the event that the proposed production schedule set out above is fulfilled, our clients will consider forgoing their claims for liquidated damages and indeed damages more generally.   In the meantime, liquidated damages will continue to accrue on all of the outstanding units as per the Purchase Agreement.*
>
> *All our clients' rights are reserved and nothing herein is to be construed as a waiver."*

---

[13] D/714

4.26    Another letter from Ince dated 15 July 2021 is in evidence[14]. It is again not marked without prejudice:

> "Despite your consistent failure to perform your obligations under the Purchase Agreement, our clients have been extremely conciliatory in proposing a new production schedule via email on 2 July 2021 at 00:03. In your 2 July Email, your Barry Qin responded in the affirmative 'for your proposal, all is fine. Please send us all the update orders and please allocate which POs are to be built in which production slot.' (the '2 July Agreement')...
>
> To our clients' great frustration, within just 10 days of the 2 July Agreement, you have reneged on your promise, saying that 'we found we actually cannot meet your below proposal.'
>
> Our clients had already, on the basis of the 2 July Agreement, made commitments to their customers, only then to be undermined entirely by you going back on your word. It is, unfortunately, becoming difficult for our clients ever to trust or believe any statement or commitment you make.
>
> Our clients are not prepared to countenance any departure from the 2 July Agreement. They have been quite accommodating enough and their patience is now at an end. Our clients accordingly call upon you to stand by the 2 July Agreement and to perform your obligations under it and under the Purchase Agreement. It is time for you to realise that contractual obligations are binding, not things you can disregard whenever you happen to find them inconvenient."

4.27    It is plain that the above 2 letters are not without prejudice communications. They are not stated as such, and their contents are merely assertions of the Defendant's rights. The Plaintiff has not otherwise adduced into evidence what it considers to be without prejudice correspondence. However, the factual matters pleaded at Statement of Claim §§17-18 are already supported by Ince's letters mentioned above, both written on an open basis and were predominantly letters asserting the Defendant's rights.

---

[14] D/722

4.28    It is entirely unclear what other without prejudice correspondence the Plaintiff is referring to, and how referring to such correspondence might shock the court's conscience.

4.29    It is also pertinent to note that Plaintiff's Skeleton Submissions §73 reads as follows:

> "Further, it is clear from the face of the Award the fact that the Arbitrator based her finding that Pan Ocean breached the Agreement in part on the privileged correspondence. This affords a further ground for holding that the Award is contrary to public policy."

4.30    First, it is not clear from the Award that the Tribunal did resort to any without prejudice material over and above the "open" correspondence. Secondly and in any event, section 81(3) of AO provides that the court does not have jurisdiction to set aside or remit an arbitral award on the ground of errors of fact or law on the face of the Award.  Even had the Tribunal erred in admitting any without prejudice correspondence, a challenge made on the ground of errors of fact or law on the face of the Award is not a valid setting aside ground.

4.31    For completeness, I deal with Mr Chong's reliance on *AZ v BY* [2023] EWHC 2388 (TCC).  *AZ* is concerned with adjudication and is not a case on setting aside of an arbitral award.  It is important to note the following distinction. It is stated at §18:

> "In Ellis Building Contractors Limited v Vincent Goldstein [2011] EWHC 269 (TCC), Akenhead J also undertook a review of the relevant authorities.  At the outset he noted that adjudicators are under a duty to apply the rules of natural justice.  He referred in this context to Cantillon Ltd v Urvasco Ltd [2008] EWHC 282 (TCC) in which the second of the principles identified in that case was that 'any breach of the rules must be more than peripheral, they must be material breaches.' Following this, Akenhead J continued:
>
> > ' 25. The improper deployment of "without prejudice" material in adjudication is something which happens in adjudication as in court although this Court has at least anecdotally seen an

*increase in this behaviour in adjudication. This often arises because parties represent themselves or are represented by consultants who are not legally qualified and, perhaps, they do not fully understand that truly "without prejudice" communications are privileged and should not be referred to in any legal or quasi-legal proceedings, including adjudication. Whilst if "without prejudice" communications surface in a court, the judge being legally qualified and experienced can usually put it out of his or her mind, it is a more pernicious practice in adjudication because most adjudicators are not legally qualified and there will often be a greater feeling of unease that the "without prejudice" material may have really influenced the adjudicator. This Court can only strongly discourage parties from deploying "without prejudice" communications in adjudication.'* " (emphasis added)

4.32    Further on at §25:

"*Both counsel submitted that the authority is not directly relevant in circumstances where this Court is in fact determining the question of whether the material submitted was without prejudice in the Part 8 claim. I agree. I would add, however, that I do not regard this as authority which goes further than stating, in the circumstances before the Court in that case, the test of apparent bias had not been made out. It is not authority, I would suggest, for the proposition that just because an adjudicator has turned his or her mind to the question of admissibility of the material, and received submissions from both parties, a challenge to that decision would not, at least under the law of England and Wales, be successful as a matter of principle. The question of admissibility is a question of law. It is trite that generally, adjudicator's decisions will be enforced notwithstanding the fact that they contain an error of law. But an error as to the admissibility of without prejudice material is an error of law that could potentially impact the fairness of the decision-making process in accordance with the rules of natural justice. It is similar, in this sense, to an error of law by an adjudicator in assessing the extent of their own jurisdiction. It is an error which can affect the enforceability of the decision. If, therefore, a court concludes (contrary to the determination of the adjudicator) that material was in fact without prejudice and that the test of apparent bias is made out, the decision should not be enforced. Not only is this the correct result analysing the position from first principles, it seems to me it also accords with the important public policy behind without prejudice communications, and, in the words of Akenhead J, is consistent with the Court's strong discouragement to parties from deploying "without prejudice" communications in adjudication.*" (emphasis added)

4.33      In the present case, the Tribunal is an experienced barrister and I have no doubt that she was able to put any reference to without prejudice communications out of her mind. In any event, as pointed out above, the Plaintiff has not adduced into evidence what it considers to be without prejudice material. I do not regard the Plaintiff can derive any assistance from *AZ*.

## 5.    *Due Procedure Ground / Scope of Arbitration Ground and related Public Policy Ground*

5.1      The complaints underpinning these grounds relate to the Tribunal's invitation for further submissions from the parties in the event that she was not minded to grant the Declaratory Relief. This led to the Defendant's pursuit and the eventual award of the Non-Delivery Claim in addition to the LD Claim (20').

5.2      What factually transpired is recorded at Award §41:

> "... *Upon the Arbitral Tribunal's further directions to the parties on 11 January 2022, 8 March 2022, 27 April 2022 and 6 May 2022, the Arbitral Tribunal further received from the Claimant (but not the Respondent) on 1 February 2022, 6 April 2022, 3 May 2022 and 13 May 2022 written submissions and clarifications on final relief including the loss and damage for breach of contract (if any), costs and interest together with their statement of costs and other enclosures...*"

5.3      In gist:

(1)    After the Defendant communicated its Statement of Claim and its first witness statement, the Tribunal, on 8 March 2022, invited the parties to address her within 14 days on the final relief in the event she was to take the view that no specific performance ought to be granted;

(2)    On 21 March 2022, the Defendant asked for more time as the Tribunal's request was not what it had anticipated needing to address. On the same day an extension of time was granted by the Tribunal;

- 38 -

(3)    On 6 April 2022, the Defendant communicated its further submissions and its second witness statement. In the second witness statement, the Defendant quantified the Non-Delivery Claim by using unit prices different from those stated in the POs;

(4)    On 25 April 2022, the Tribunal indicated to the parties that she would proceed to decide the dispute on the basis of the documentary evidence available;

(5)    On 27 April 2022, the Tribunal requested the parties to address the basis of the Defendant's adoption of unit prices different from those set out in the POs;

(6)    On 3 May 2022, the Defendant provided an explanation for adopting unit prices different from those set out in the POs, but "*for the sake of simplicity*" indicated to the Tribunal that it was prepared to adopt the unit prices as per the POs ("**Revised Table**"). As a result, the quantification of the Non-Delivery reduced from US$8,288,716 to US$5,923,372;

(7)    On 6 May 2022, the Tribunal requested further clarification on how the figures set out in the Revised Table were calculated and directed the parties to address her within 14 days. As the original deadline for rendering the Award was on 16 May 2022, the Tribunal further indicated to the parties that she would seek an extension of time pursuant to Article 42.2(f) of the 2018 Rules to 16 July 2022; and

(8)    On 13 May 2022, the Defendant provided an explanation of the Revised Table. Essentially, the unit prices set out in the Revised Table were obtained through a simple arithmetic exercise of

- 39 -

obtaining a weighted average of the different unit prices in the various POs.

5.4       As set out at Award §110:

> "*Insofar as the contract price is concerned, the Claimant adopts the weighted average purchase agreement price ("WAPrice") which is calculated based on the total sum of (units ordered under each purchase order times purchase order price for the corresponding purchase orders) divided by the total number of units ordered for that type of containers . The Claimant submits and the Arbitral Tribunal is satisfied that the use of the weighted average approach is convenient for the purpose of calculating the contract prices taking into account the different types of containers and their different agreed prices .*"

5.5       The Plaintiff's complaints in respect of the above matters are formulated in a number of different ways:

(1)     The Non-Delivery Claim is not within the scope of the arbitration;

(2)     It is said that the Tribunal failed to act fairly and impartially and conducted the Arbitral Proceedings to the advantage of the Defendant and disadvantage of the Plaintiff by inviting further rounds of submission on the basis that specific performance would not be granted thereby resulting in the award of the Non-Delivery Claim;

(3)     The above process was in any event not in accordance with the streamlined procedure contemplated under the Expedited Procedure. It is clear that the Tribunal did not accept the Defendant's initial case (in departing from the unit prices set out in the POs) but afforded further opportunities to the Defendant to "perfect" its case;

(4)     The Revised Table was not backed up by witness statements; and

(5)    There was no exceptional circumstances warranting the Tribunal seeking an extension of time to render the Award.

5.6    I am unable to accept that any of the above complaints has any merit.

5.7    First, it is plain that the Non-Delivery Claim was referred to arbitration. I have already set out at §§4.9 to 4.11 above the relevant parts of the NOA and the Statement of Claim and at §4.13 above the relevant parts of the Award setting out the Tribunal's decision that she was of the view that the Defendant had no legitimate interest in keeping the Purchase Agreement alive and therefore she was not minded to defer dealing with the Non-Delivery Claim. Where, as here, the Defendant had by the NOA and Statement of Claim asked the Tribunal to reserve its jurisdiction for any claim for damages for non-delivery. I do not see how it can be said that the pursuit by the Defendant of an award for the Non-Delivery Claim as its final relief was outside the scope of the arbitration.

5.8    As pointed out at *The Hong Kong Arbitration Ordinance (Commentary and Annotations)*, 2nd Ed at 81.52, the question for determination is whether the Award (1) dealt with a difference not contemplated by the submission to arbitration, (2) dealt with a different not falling within the terms of the submission of the arbitration, or (3) decided matters beyond the scope of the submission of the arbitration. In my view, the Non-Delivery Claim does not fall foul of any of the foregoing.

5.9    Secondly and relatedly, I agree with Mr Brown that it was entirely appropriate for the Tribunal to ask the parties to address her on damages if she was disinclined to grant the Declaratory Relief.

5.10    Thirdly, I do not agree that the approach adopted by the Tribunal was not in accordance with the Expedited Procedure. Article 42 of the 2018 Rules

does not oust Article 13.1, which enjoins the Tribunal to adopt suitable procedures for the conduct of the Arbitral Proceedings, provided that such procedures ensure equal treatment of the parties and afford the parties a reasonable opportunity to present their case. Throughout the entire process, due notices were given to the Plaintiff to address the Tribunal, which opportunities were not taken up by the Plaintiff.

5.11    Fourthly, I do not see how it can be said that the Defendant's reliance on the Revised Table required further witness statements. The POs were already in evidence and the weighted averages involved only an arithmetic calculation. I also do not see any merit in criticizing the Defendant for its initial larger quantification, and the Tribunal's alleged failure to form a negative view on the credibility of the Defendant's case. As stated above, the Defendant conceded on a lower quantification for the sake of simplicity, which stance does not mean that its initial case, if pursued, would not be accepted by the Tribunal, bearing in mind that there was no evidence adduced by the Plaintiff to the contrary.

5.12    Fifthly, given the chronology stated above, I do not see how it can be said that the short extension sought for by the Tribunal to render the Award was not in accordance with the Expedited Process. As pointed out by Mr Brown, the Tribunal's request was approved by HKIAC. There is no separate complaint made by the Plaintiff against HKIAC.

5.13    In so far as any of the above complaints is also pursued under the Public Policy Ground, I do not regard any of them has the effect of amounting to any breach of natural justice or shocking the court's conscience.

## 6.    *The Amendment Application*

- 42 -

6.1        Given my conclusion on the lack of merits in the Scope of Arbitration Ground and the Due Procedure, I dismiss the Amendment Application.

6.2        In so far as necessary, I would also dismiss the Amendment Application on the basis that no proper explanation has been proffered by the Plaintiff to explain the toing and froing in its formulation of the setting aside grounds. Whether one treats the Amendment Application is one for an extension of time (as Mr Chong contends) or as one for amendment (as Mr Brown contends), it seems to me that an explanation is required for the Plaintiff's abandonment and resurrection of the Scope of Arbitration Ground and the Due Procedure Ground.

## 7.    *Conclusion*

7.1        For the above reasons, I grant the EOT Application (on the basis that it is unopposed) but dismiss the AOS. I also dismiss the Amendment Application.

7.2        I also make a costs order *nisi* that the Plaintiff is to pay to the Defendant the costs of the AOS (including the EOT Application and any costs reserved) and the Amendment Application on an indemnity basis, to be taxed if not agreed.

(Jonathan Wong)

Deputy High Court Judge

Mr Patrick CHONG, Ms Athena WONG and Mr Han Sheng LIM, instructed by
    Messrs. Wat & Co., for the Plaintiff

Mr. Toby BROWN, instructed by Messrs. Squire Patton Boggs, for the Defendant

J. Stephen Simms (*pro hac vice* pending)
Gary C. Muphy (*pro hac vice* pending)
Simms Showers LLP
201 International Circle, Suite 230
Baltimore, Maryland 21030
443-290-8704
Facsimile 410-510-1789
jssimms@simmsshowers.com
gcmurphy@simmsshowers.com

Marisa G. Huber
GIBSON ROBB & LINDH LLP
1255 Powell Street
Emeryville, California 94608
Phone: (415) 348-6000
Facsimile: (415) 346-6001
Email: mhuber@gibsonrobb.com

Attorneys for Plaintiff
Spinnaker Equipment Services, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Spinnaker Equipment Services, Inc., a California corporation, | Case No. 25-cv-782 |
| Plaintiff, | IN ADMIRALTY, Fed. R. Civ. P. 9(h) |
| v. | |
| Pan Ocean Container Supplies Co., Ltd., a Chinese limited company, | **INTERROGATORIES TO GARNISHEE CAI INTERNATIONAL, INC.** |
| Defendant, | |
| and | |
| CAI International, Inc., a Delaware corporation, et al., | |
| Garnishees. | |

The following Interrogatories are propounded upon CAI International, Inc. ("CAI") pursuant to Supplemental Rule B. CAI must answer the following Interrogatories separately

and fully, in writing and under penalty of perjury, and must further serve its answers within twenty-one (21) days after the Interrogatories are served on CAI, pursuant to Supplemental Rule B(3)(a).  These Interrogatories impose a continuing obligation pursuant to Fed. R. Civ. P. 26(e).

In answering these Interrogatories, CAI must furnish all information available to it, including information in possession of its attorneys and all persons acting on, or for, CAI's behalf.  If CAI cannot answer any Interrogatory in full after exercising due diligence to secure the information requested, it must so state in its answer to the extent possible, specifying its inability to answer the remainder while providing whatever information or knowledge it has concerning the unanswered portions and the efforts it has undertaken to secure the information sought. CAI is reminded that all answers must be made separately and fully, and that an incomplete or evasive answer is a failure to answer.

### INSTRUCTIONS

1.  These instructions and definitions should be construed to require answers based upon the knowledge of, and information available to, the responding party as well as its agents, representatives, and, unless privileged, attorneys.  It is intended that the following discovery requests will not solicit any material protected either by the attorney/client privilege or work product doctrine which was created by, or developed by, counsel for the responding party after the date on which this litigation was commenced.  If any inquiry is susceptible of a construction which calls for the production of such material, that material need not be provided and no privilege log pursuant to Fed. R. Civ. P. 26(b)(5) will be required as to such material.

2.  These Interrogatories are continuing in character, so as to require that supplemental answers be filed seasonably if further or different information is obtained with respect to any interrogatory.

3.  No part of an interrogatory should be left unanswered merely because an objection is interposed to another part of the interrogatory.  If a partial or incomplete answer is provided, the responding party shall state that the answer is partial or incomplete.

4.  In accordance with Fed. R. Civ. P. 26(b)(5), where a claim of privilege is asserted in objecting to any interrogatory or part thereof, and information is not provided on the basis of such assertion:

      A.    In asserting the privilege, the responding party shall, in the objection to the interrogatory, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed;

      B.    The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information,

          (1) For oral communications:

             a.    the name of the person making the communication and the names of persons present while the communication was made, and, where not apparent, the relationship of the persons present to the person making the communication;

             b.  the date and place of the communication; and

             c.  the general subject matter of the communication.

          (2) For documents:

             a.  the type of document,

             b.  the general subject matter of the document,

             c.  the date of the document, and

             d.  such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

5.   If the responding party elects to specify and produce business records in answer to any interrogatory, the specification shall be in sufficient detail to permit the interrogating party to locate and identify, as readily as the responding party can, the business records from which the answer may be ascertained.

6.   If, in answering these interrogatories, the responding party encounters any ambiguities when construing a question, instruction, or definition, the responding party's answer shall set forth the matter deemed ambiguous and the construction used in answering

## DEFINITIONS

Notwithstanding any definition below, each word, term, or phrase used in these Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

1.   Concerning:  The term concerning means concerning, referring to, concerning, evidencing, or constituting.

2.   Communication:  The term communication means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3.   Document:  The term document and documents is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of the term "document."

4.   Identify (with respect to persons):  When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that

person.

5.  Identify (with respect to documents):  When referring to documents, to "identify" means to give, to the extent known, the: (i) type of document; (ii) general subject matter; (iii) date of the document; and, (iv) author(s), addressee(s), and recipient(s).  In the alternative, the responding party may produce the documents, together with identifying information sufficient to satisfy Fed. R. Civ. P.  33(d).

6.  All/Any/Each: The terms "all," "each", and "any" shall be construed as encompassing any and all.

7.  And/Or:  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

8.  You/Your:  The terms "you" and "your" shall mean CAI International, Inc. and any and/or all of its subsidiaries and affiliates.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  Identify any relationship that CAI has, or has had, with Pan Ocean Container Supplies Co., Ltd. ("Pan Ocean").

**INTERROGATORY NO. 2:**  Identify all accounts, amounts or anything of value payable to, or on behalf of Pan Ocean.

**INTERROGATORY NO. 3:**  Identify any agreements, including but not limited to contracts, between you, your affiliates and /or subsidiaries or agents, and Pan Ocean, and/or any of its subsidiaries between June 1, 2024 and the present.

**INTERROGATORY NO. 4:**  State whether anyone associated with CAI has notified Pan Ocean of the litigation from which this garnishment action stemmed and, if so, identify the individual(s) making the notification and the individual(s) notified.

**INTERROGATORY NO. 5:**  Identify all individuals at Pan Ocean with whom or which CAI has communicated between June 1, 2024 and the present including, but not limited to, each contact's name, job title, telephone number, cell phone number, fax number, mailing address, and e-mail address.

**INTERROGATORY NO. 6:**  Identify all contacts you have, whether directly or through any agent or attorney, at Pan Ocean including, but not limited to, each contact's name, job title, telephone number, cell phone number, fax number, mailing address, and e-mail address.

**INTERROGATORY NO. 7:**  Describe in detail all property, tangible or intangible, of or which could be or is claimed by Pan Ocean which you hold, control, or over which you otherwise have custody.

**INTERROGATORY NO. 8:**  Identify any invoices issued to you by Pan Ocean and/or any of its agents or subsidiaries between June 1, 2024 and the present.

**INTERROGATORY NO. 9:**  Identify any communications between you and Pan Ocean and/or any of its subsidiaries or affiliates between June 1, 2024 and the present.

Date:  February 7, 2025.

Respectfully submitted,

GIBSON ROBB & LINDH LLP

Marisa G. Huber
mhuber@gibsonrobb.com

/s/ J. Stephen Simms
J. Stephen Simms (*pro hac vice* pending)
Gary C. Muphy (*pro hac vice* pending)
Simms Showers LLP

Spinnaker Counsel